**FRONTENAC BANK, Respondent/Cross Appellant,**

v.

**T.R. HUGHES, INC., Summit Pointe, L.C., Thomas R. Hughes, and Carolyn A. Hughes, Appellants/Cross-Respondents.**

**No. ED 97499.**

Missouri Court of Appeals, Eastern District, Division Three.

Sept. 25, 2012.

Motion For Rehearing And/Or Transfer to Supreme Court Denied Nov. 13, 2012.

Application for Transfer Denied Jan. 29, 2013.

R. Thomas Avery, Douglas A. Stockenberg, St. Louis, MO, for Appellant.

Ronald A. Norwood, Larry E. Parres, St. Louis, MO, for Respondent.

ROY L. RICHTER, Judge.

Plaintiff Frontenac Bank ("Frontenac") sued Defendants/Cross–Appellants Summit Point, L.C. ("Summit"), T.R. Hughes, Inc. ("Homebuilder"), Thomas R. Hughes ("Thomas"), (collectively, "Defendants"), and Thomas's wife Carolyn Hughes ("Carolyn") to recover on seven promissory notes and certain related guaranty agreements. The circuit court granted summary judgment in favor of Frontenac with respect to its claims against Defendants, from which Defendants now appeal. Additionally, after evidence was presented at trial, the circuit court found in favor of Carolyn, granting her equitable relief

based on her affirmative defense that Frontenac violated the Equal Credit Opportunity Act, 15 U.S.C. § 1691 et seq. ("ECOA"), with respect to Frontenac's claims against her. From this judgment, Frontenac now appeals. We affirm in part and reverse in part.

## I. BACKGROUND

In 2003, Homebuilder and Summit (collectively, "Borrowers") obtained financing from Frontenac for the development and construction of two real estate projects in the greater St. Louis area. Pursuant to Frontenac's financing, Borrowers entered into certain loan agreements, including seven promissory notes ("Notes"). Summit entered into three loans, designated as # 1124002, # 1124003, and # 1124004. Homebuilder agreed to four loans, designated as # 1219072, # 1219074, # 2309001, and # 2309003. They also executed certain deeds of trust, by which certain real property secured the aforementioned loans. Additionally, Thomas and his wife Carolyn executed personal guaranty agreements relating to the projects.

In 2009, Frontenac declared all outstanding Notes in default on the basis of insecurity[1] and demanded full payment of the amount due. On October 8, 22, and 27, 2009, Frontenac caused three foreclosure sales to occur whereby the properties securing the loans were sold to Frontenac, the only purchaser at the sale. The properties were sold pursuant to three successor trustee deeds, for the following amounts: $1,461,923, $275,000, and $170,000.

On December 3, 2009, Frontenac filed a 16–count petition ("Petition") against Defendants, and Carolyn, to recover the out-

---

1. The promissory Notes state the following constitutes an event of default: "Insecurity. *Lender in good faith believes itself insecure.*"

standing loan balances arising from the seven Notes in default. Defendants and Carolyn counterclaimed with three claims against Frontenac: breach of contract, breach of the duty of good faith and fair dealing, and fraud. The circuit court dismissed the counterclaims as affirmative claims for relief, but found the allegations formed the factual basis for Defendants' affirmative defenses.

On November 5, 2010, Frontenac filed its Motion for Summary Judgment on all counts of its Petition against all parties, along with supporting materials. Defendants and Carolyn filed their First Amended Affirmative Defenses, including the defense that the guarantees sued upon by Frontenac are void, invalid, and/or otherwise unenforceable because Frontenac violated the ECOA by requiring Thomas and Carolyn to provide personal guarantees for the promissory Notes. Defendants asserted that the borrower for each Note was sufficiently creditworthy such that no guarantees were necessary.

Defendants opposed the summary judgment motion, and, after a hearing, the circuit court entered summary judgment in favor of Frontenac and against Homebuilder for $933,206.81 (Counts I, II, III, IV, and X), Summit for $3,389,138.19 (Counts VII, XI, and XIV), and Thomas for $3,619,248.30 (Counts V, VIII, XII, and XV). As to Carolyn, the circuit court granted, in part, Frontenac's motion for summary judgment against Carolyn (Counts VI, IX, XIII, and XVI) on all factual and legal issues comprising the prima facie case under each count, but sustained her affirmative defense that her personal guarantees were obtained in violation of the ECOA, and thus, they were null and void. The court reserved for trial a determination of such defense.

A trial took place on May 23–24, 2011. On June 16, 2011, the court entered its Findings of Fact, Conclusions of Law and Judgment, ruling in favor of Carolyn by concluding that her guarantees were invalid and unenforceable because they constituted discrimination based on marital status in violation of the ECOA. Specifically, the circuit court found that Thomas submitted certain joint financial statements in connection with the loans sought by Borrowers, and those statements summarized the then-current financial situation of Thomas and Carolyn. However, the court also found Carolyn did not intend such submission to be an application for credit or an offer to provide a personal guaranty. Further, the court found that Frontenac deemed Thomas's submission of the joint financial statements as an application for joint credit. The circuit court also found Carolyn did not offer to execute the guarantees, but only did so at Frontenac's insistence in support of the Borrowers' loan applications. The court concluded, *inter alia*, (1) "the only discernible standard within [Frontenac's] loan policy regarding a potential borrower's creditworthiness with respect to real estate loan transactions are three specific loan-to-value ratios which determine whether a given loan is 'conforming' "; (2) Frontenac violated the ECOA in that it wrongfully demanded that Carolyn execute the guarantees because the Borrowers were independently creditworthy under Frontenac's own standards of creditworthiness, in that each loan sued upon by Frontenac was "conforming" pursuant to Frontenac's loan-to-value ratios; and (3) Carolyn was not a member or manager of Summit and, although she was listed as treasurer for Homebuilder in annual reports filed with the Missouri Secretary of State, "Carolyn had no involvement with the operations of [Homebuilder]."

Frontenac filed a motion to vacate and amend the judgment, but the circuit court denied the motion. On October 4, 2011,

Frontenac filed its Notice of Appeal, challenging the judgment in favor of Carolyn and against Frontenac. On October 14, 2011, Defendants filed a Notice of Appeal, appealing from the circuit court's order and judgment in favor of Frontenac and against Defendants with respect to summary judgment granted. The Court of Appeals consolidated the two appeals as follows.

## II. DISCUSSION

### A. Defendants' Appeal

Defendants argue two points on appeal. First, they allege the circuit court erred in granting summary judgment in favor of Frontenac on Counts I, II, III, IV, V, VII, VIII, X, XI, XII, XIV, and XV of Frontenac's Petition because there was a genuine dispute as to one or more material facts underlying each of Frontenac's affirmative claims. Defendants claim that the deficiency judgment entered against them was based upon the prices paid by Frontenac at the foreclosure sales, which prices were grossly inadequate and far below fair market value. Thus, Defendants argue there should be no deficiency judgment entered against them, or, in the alternative, any deficiency should be based upon the greater of the fair market value of the real property on the date of the foreclosure sales or the price paid at the foreclosure sales.

Second, Defendants allege the circuit court erred in granting summary judgment in favor of Frontenac on the above counts of Frontenac's Petition because there was a genuine dispute regarding one or more material facts supporting Defendants' amended affirmative defenses: (A) that Frontenac previously committed a material breach of the promissory Notes sued upon, which breach(es) precluded Frontenac from enforcing the promissory Notes against Defendants as a matter of law; and (B) that Frontenac breached the duty of good faith and fair dealing, and thus, Frontenac is not entitled to a deficiency judgment against Defendants.

### 1. Standard of Review

The standard of review for an appeal from summary judgment is essentially *de novo*. *Am. Family Mut. Ins. Co. v. St. Clair*, 295 S.W.3d 586, 591 (Mo.App. E.D.2009) (citing *ITT Commercial Fin. Corp. v. Mid–Am. Marine Supply Corp.*, 854 S.W.2d 371, 376 (Mo. banc 1993)). Summary judgment will be upheld on appeal if there is no genuine dispute of material fact and the movant is entitled to judgment as a matter of law. *Id.* The appellate court reviews the record, and all reasonable inferences therefrom in the light most favorable to the non-moving party. *ITT Commercial Fin. Corp.*, 854 S.W.2d at 376.

### 2. No Genuine Dispute as to Defendants' Deficiency Based on Prices Paid at Foreclosure Sales.

Defendants first argue that a genuine issue of material fact existed regarding the amount of the deficiency due under the promissory Notes. Defendants allege that because the prices paid by Frontenac at the foreclosure sales were "grossly inadequate" and far below the fair market value, the deficiency should have been based on the greater of the fair market value of the real property on the date of the foreclosure sales or the prices paid at the foreclosure sale.

The Missouri Supreme Court squarely addressed a deficiency calculation after a foreclosure in its recent opinion, *First Bank v. Fischer & Frichtel, Inc.*, 364 S.W.3d 216 (Mo. banc 2012). Like Defendants here, real estate developer Fischer & Frichtel borrowed from a bank and owed a deficiency on foreclosed real prop-

erty. *Id.* at 217–18. The developer argued that debtors in Missouri should be allowed to pay only the difference between the debt and the fair market value of the property at the time of the foreclosure if the debtor challenges the foreclosure price. *Id.* at 220. The Supreme Court, however, was not persuaded by Fischer & Frichtel's public policy argument and refused to modify "the more than century-old practice of using the foreclosure sale price" rather than fair market value to determine a deficiency. *Id.* at 224. An inadequate foreclosure sale price, the Court noted, may be attacked in an action to void the foreclosure sale itself. *Id.* at 220–21. To do so, a debtor must show that "the inadequacy . . . [of the sale price is] so gross that it shocks the conscience . . . and is in itself evidence of fraud." *Id.* at 221 (quoting *Cockrell v. Taylor,* 347 Mo. 1, 145 S.W.2d 416, 422 (1940)).

■ In accordance with the Missouri Supreme Court's affirmation of well-established law in Missouri, we find Defendants' loans were credited properly with the amounts paid by Frontenac at the foreclosure sales. Defendants did not attempt to void the foreclosure sales themselves at the time of the sales, or allege fraud in the sales. Frontenac complied with Missouri law to conduct the foreclosure sales and credit Defendants' loans with the amounts received.

■ Defendants argue that there was a genuine issue of material fact regarding whether Frontenac breached its duty of good faith and fair dealing in the foreclosure sales. In support, Defendants provide Thomas's statement that if Frontenac and the trustee had given longer notice of the foreclosure sales or had granted the winning bidder additional time to secure financing rather than demanding funds for the full amount on the days of the sales, it would have increased the likelihood that additional bidders would have been present at the foreclosure sales, and in turn, would have increased the likelihood of substantially higher prices paid for the foreclosed properties. Noting first that Defendants failed to take issue with the time allowances at the time of the foreclosure sales, we agree with Frontenac that Defendants' supporting affidavit is vague and speculative here. "Expert opinions founded on speculation are not sufficient to raise disputed issues of fact." *Neiswonger v. Margulis,* 203 S.W.3d 754, 759 (Mo.App. E.D.2006). Thomas's affidavit statements are insufficient to establish any breach of implied duty of good faith and fair dealing.

Thus, there was no genuine issue of material fact regarding the deficiency balances, or a breach in conducting the foreclosure sales. The circuit court properly awarded judgment as a matter of law in favor of Frontenac on Counts I, II, III, IV, VII, XI, and XIV seeking recovery under the underlying Notes, and Counts V, VIII, X, XII, and XV seeking recovery under the personal guarantees by Defendants. Defendants' first point is denied.

### 3. Breach of Contract or Good Faith by Frontenac is in Genuine Dispute.

In their second point, Defendants argue that Frontenac breached each of the Notes based on an improper declaration of insecurity and a breach of its duty of good faith and fair dealing. Thus, Defendants argue Frontenac is not entitled to a deficiency judgment based on these genuine disputes of material fact.

Regarding Frontenac's initial alleged breach, Defendants contend Frontenac wrongfully refused to permit Summit to draw on a certain Note in order to make interest payments on the other outstanding promissory Notes, which then set in motion a sequence of wrongful defaults of all the outstanding Notes. Specifically,

Defendants allege that loan # 1124004 was established by Summit in October 2007 to make interest payments then due on the other promissory Notes executed by Summit and Homebuilder. Defendants further argue Frontenac had no good faith basis for the defaults based on "insecurity" given that it renewed several of the Notes shortly before declaring the defaults without any subsequent material changes taking place.

In determining whether Frontenac properly withheld advances under the first Note, # 1124004, initially we look to the express provisions in the Note:

> Lender will have no obligation to advance funds under this Note if: (A) Borrower or any guarantor is in default under the terms of this Note or any agreement that Borrower or any guarantor has with Lender, including any agreement made in connection with the signing of this Note; (B) Borrower or any guarantor ceases doing business or is insolvent; (C) any guarantor seeks, claims or otherwise attempts to limit, modify or revoke such guarantor's guarantees of this Note or any other loan with Lender; . . . or (E) Lender in good faith believes itself insecure.

■ Insolvency, which is one of the criteria listed in the Note above, has been described in several ways by Missouri courts, but notably as an "inability to pay debts as they become due in the ordinary course of business." *Adams v. Richardson*, 337 S.W.2d 911, 916 (Mo.1960); *First State Bank v. Reorganized Sch. Dist. R–3, Bunker, Mo.*, 495 S.W.2d 471, 479 (Mo. App.1973). Additionally, insolvency occurs when "the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation." Section 428.014.1, RSMo.[2]

Further, a debtor who generally is not paying his debts as they become due is presumed to be insolvent in Missouri. Section 428.014.2.

■ We further analyze Frontenac's refusal to permit withdrawals on its good faith belief of insecurity. The Western District Court of Appeals has explained, "There is much confusion surrounding the covenant of good faith. It is not a general reasonableness requirement." *Schell v. LifeMark Hosps. of Mo.*, 92 S.W.3d 222, 230 (Mo.App. W.D.2002) (citing *Rigby Corp. v. Boatmen's Bank and Trust Co.*, 713 S.W.2d 517, 526 (Mo.App. W.D.1986) (holding that defendant was in "good faith" when he acted on what he believed he knows, whether or not what he believed was true or reasonable to believe)). If good faith were read to require "reasonableness" in contracting, it might otherwise displace the parties' actual agreement. *Schell*, 92 S.W.3d at 230–31. "Reasonableness" is only used as evidence of subjective intent to undermine fulfillment of a contract. *Id.* at 231. Good faith is an "obligation imposed by law to prevent opportunistic behavior, that is, the exploitation of changing economic conditions to ensure gains in excess of those reasonably expected at the time of contracting." *Id.* at 230.

The evidence presented here is that loan # 1124004, with a principal amount of $665,000 was established by Summit in October 2007. From November 2007 to early 2009, Summit drew $128,334.52 on that loan's line of credit, which in turn was used to pay interest on the other Notes. In early 2009, Frontenac refused to permit Summit to make further draws on loan # 1124004, with its remaining balance

---

**2.** Unless otherwise indicated, all subsequent statutory references are to RSMo Cum.Supp. 2008.

of $536,665.48 of untapped principal. At this time, however, Summit was current on all payments then due under all outstanding promissory Notes, including loan # 1124004. Defendants claim that this refusal to permit further draws subsequently prevented them from making interest payments on the other Notes, which ultimately resulted in Frontenac declaring the other Notes in default for alleged nonpayment.

Defendants maintain that Frontenac's refusal to permit further draws on loan # 1124004 was improper because Frontenac had not declared a default of any of the promissory Notes at that time, and had no basis for doing so because Summit and Homebuilder were current on all interest payments then due under all Notes. In response, Frontenac claims that it was entitled to refuse further draws under loan # 1124004 on the basis of "insecurity" due to an unforeseeable economic crisis at the time the loan agreements were signed. The testimonial evidence from Frontenac's CEO Robert Robertson included a statement that Homebuilder was

> facing material, adverse changes. Home and lot sales had virtually ceased. It was pretty much common knowledge that they were in default at that point on most of their other banking relationships for nonpayment. There ha[d] been substantial reductions in force. Liquidity had been consumed and the value of the Bank's collateral continued to deteriorate. All generating a whole climate of insecurity.

Frontenac also argues it was entitled to refuse draws because it believed in good faith that Summit was "insolvent" based on evidence regarding its financial condition. It alleges that Summit could not pay its bills as they became due as of June 2009. Defendants presented several facts to support its contrary position, including that

Summit paid its regular bills in the ordinary course of business in June 2009, and that Homebuilder still had two employees in June 2009 and was not out of business. Moreover, Frontenac had recently allowed Defendants to renew several loans to extend the maturity dates, and no material change had occurred since such renewals.

██ As this argument exchange makes clear, the issues of insolvency and a good faith belief for insecurity are not well-defined for purposes of a summary judgment motion. Given the evidence before this Court, we find there are genuine issues of material fact with respect to Defendants' insolvency, whether degrees of insolvency exist, and what was required prior to Frontenac's refusal to permit further advances on loan # 1124004. In the alternative, under Frontenac's claim that it refused the advances of funds under the good faith belief that Defendants were insecure, we also find genuine disputes of material fact, namely what "good faith" was required by Frontenac and whether Defendants were "insecure" under the Note's provision. Despite evidence on the record of Defendants' financial struggles, Frontenac was under the "good faith" obligation to avoid exploiting the changing economic conditions to make gains in excess of those reasonably expected at the time of contracting. *Schell*, 92 S.W.3d at 230.

Finally, Defendants argue that loan # 1124004 was a "Line of Credit Loan," which was established for the purpose of paying interest on the other loans. Thus, Defendants argue that Frontenac's wrongful refusal to permit further draws on the line of credit loan—its material breach—resulted in the wrongful declaration of the other Notes in default for nonpayment. Although Defendants cite testimony tying the line of credit loan to the others, they cite no provision of any of the other loan

documents relating to repayment based on the line of credit loan. This, Frontenac argues, constitutes prohibited parol evidence. We disagree.

"The parol evidence rule ... prohibits the *contradiction* of integrated contracts. It does not apply to parol testimony that does not contradict the terms of an integrated agreement." *Wheelhouse Marina Real Estate, L.L.C. v. Bommarito,* 284 S.W.3d 761, 770 (Mo.App. S.D.2009) (citing *Gibson v. Harl,* 857 S.W.2d 260, 270 (Mo.App. W.D.1993)). "Even a complete and integrated contract must be interpreted. Admission of oral testimony of agreements or negotiations contemporaneous with the execution of the written agreement are admissible to establish the meaning of the contract." *Id.*

Here, Thomas explained that as a direct result of Frontenac's refusal to permit further draws on the line of credit loan, Borrowers were subsequently unable to make payments on the other Notes, which ultimately resulted in Frontenac declaring the other Notes in default for nonpayment. Along those same lines, Frontenac's corporate designee, Mr. Robertson, testified during his deposition that the proceeds of the line of credit loan could be used to make interest payments for other loans Summit had with Frontenac. Frontenac also admitted that from November 2007 through November 2008, Summit made interest payments on three other loans, as well as interest payments due thereon, from loan # 1124004. This oral testimony does not contradict or change the terms of the written contracts. Accordingly, this testimony from Defendants and Frontenac is admissible in explaining that the purpose of the line of credit was to make payments on Defendants' other loans.

Because we find genuine disputes of material fact in existence regarding Defen-

dant's Amended Affirmative Defense No. 2, that Frontenac first materially breached each of the promissory Notes upon which it sues, we find the circuit court erred in entering summary judgment on Counts I, II, III, IV, VII, XI, and XIV, seeking recovery under the underlying Notes, and Counts V, VIII, X, XII, and XV, seeking recovery on the personal guarantees of Thomas, Homebuilder, and Summit. Defendants' second point is granted.

### 4. Conclusion

The circuit court erred in entering summary judgment in favor of Frontenac and against Homebuilder for $933,206.81 (Counts I, II, III, IV, and X), Summit for $3,389,138.19 (Counts VII, XI, and XIV), and Thomas for $3,619,248.30 (Counts V, VIII, XII, and XV) with respect to Frontenac's claims arising from the loan agreements, including Notes and guaranty agreements. The judgment of the circuit court is reversed and remanded for further proceedings related to these genuine disputes of material fact.

### B. Frontenac's Appeal

Frontenac argues six points on appeal. Three of Frontenac's points allege the circuit court erred in making certain findings, and three of its points allege the circuit court erred in declaring Carolyn's personal guarantees null and void under the ECOA.

Regarding the claimed errors in the court's findings, Frontenac alleges in Point III that Summit and Homebuilder were not independently creditworthy based on overwhelming evidence establishing that Frontenac considered many factors besides "loan-to-value" ratios. Additionally, in Point IV, Frontenac alleges Carolyn was an officer or director of the businesses based on the evidence showing that she and her husband submitted documentation to the Missouri Secretary of State and

Frontenac indicating she was treasurer of Homebuilder and a member and part owner of Summit. Finally, Frontenac contends in Point V that Carolyn voluntarily offered her personal guarantees to Frontenac as security for loans to businesses owned by Carolyn and her husband based on the written documentation establishing that Carolyn's personal guarantees were offered as additional security for the business loans.

Regarding Frontenac's claims that the circuit court erred in declaring Carolyn's personal guarantees void under the ECOA, Frontenac alleges first in Point I that because Missouri property law follows the "tenants by the entireties" rules, a lender may require a personal guaranty from Carolyn because she jointly owned assets with Thomas. Second, Frontenac alleges in Point II that the ECOA does not prohibit a spouse from providing a personal guaranty where his or her applicant/guarantor spouse is not "independently creditworthy" and there was no evidence presented by Carolyn and no finding by the court that Thomas was independently creditworthy. Finally, Frontenac contends in Point VI that the circuit court erred in declaring Carolyn's personal guarantees void under the ECOA because the ECOA and its regulations are not extended to spousal guarantees.

We discuss each of these six points more specifically in turn. Before doing so, however, we give due regard to the applicable standard of review in this court-tried case.

### 1. Standard of Review

■■■ In appeals from a court-tried civil case, the trial court's judgment will be affirmed unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law. *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976). To set aside a judgment as "against the weight of

the evidence," this Court must have a firm belief that the judgment is wrong. *Id.*

The Missouri Supreme Court recently clarified the standard of review for court-tried civil cases in *White v. Director of Revenue*, 321 S.W.3d 298, 307–08 (Mo. banc 2010), and reiterated the same in *Johnson v. State*, 366 S.W.3d 11, 18–19 (Mo. banc 2012). In *White*, the Court noted that in reviewing contested issues, the nature of the appellate court's review is directed by whether the matter contested is a question of fact or law. Questions of law are reviewed *de novo*, while deference is given to the factfinder's assessment of the evidence on contested issues of fact. *Id.*

■■■ The *White* Court further outlined the role of an appellate court as follows:

It is only when the evidence is uncontested that no deference is given to the trial court's findings. Evidence is uncontested in a court-tried case when the issue before the trial court involves only stipulated facts and does not involve resolution by the trial court of contested testimony; in that circumstance, the only question before the appellate court is whether the trial court drew the proper legal conclusions from the facts stipulated. Evidence also is uncontested when a party "has admitted in its pleadings, by counsel, or through the [party's] individual testimony the basic facts of [other party's] case." In such cases, the issue is legal, and there is no finding of fact to which to defer.

\* \* \*

When evidence is contested by disputing a fact in any manner, this Court defers to the trial court's determination of credibility. A trial court is free to disbelieve any, all, or none of that evidence. Appellate courts defer to the

trial court on factual issues "because it is in a better position not only to judge the credibility of the witnesses and the persons directly, but also their sincerity and character and other trial intangibles which may not be completely revealed by the record." The appellate court's role is not to re-evaluate testimony through its own perspective. Rather, the appellate court confines itself to determining whether substantial evidence exists to support the trial court's judgment; whether the judgment is against the weight of the evidence—"weight" denoting probative value and not the quantity of the evidence; or whether the trial court erroneously declared or misapplied the law.

*Id.* (citations omitted). The party asserting the affirmative defense bears the burden of proof in civil actions. *Johnson,* 366 S.W.3d at 19.

### 2. Circuit Court's Findings of Fact with Regard to Trial on ECOA Defense

Before addressing the points on appeal raised by Defendants as to why the circuit court erred in its findings and conclusions related to the ECOA, it is important here to review the circuit court's findings of fact. The court made the following findings:

i. In connection with the loans sought by Borrowers, Thomas submitted certain joint financial statements, which summarized the then-current financial situation of Thomas and Carolyn.

ii. Carolyn did not intend to apply for credit with Frontenac by Thomas's submission of the couple's joint financial statements. Further, Carolyn did not intend the submission of the couple's joint financial statements to be an offer to provide a personal guaranty to Frontenac.

iii. Frontenac deemed Thomas's submission of the couple's joint financial statements as an application for joint credit.

iv. It was Frontenac's practice to require the submission of financial statements and then to consider the submission of a joint financial statement as an application for joint credit.

v. Carolyn did not offer to execute the guarantees sued upon by Frontenac, but rather, only did so at Frontenac's insistence in support of Borrowers' loan applications. Specifically, Frontenac demanded the guarantees from Carolyn as a condition for entering into the promissory notes sued upon in this case.

vi. In connection with a potential borrower's application for a real estate-related loan, Frontenac has at all relevant times had a "Loan Policy" in place, which articulates Frontenac's internal policies with respect to the consideration of all such loans, including Frontenac's standards regarding the creditworthiness of a loan applicant.

vii. The only discernible standard within Frontenac's Loan Policy regarding a potential borrower's creditworthiness with respect to real estate loan transactions are three specific loan-to-value ratios which determine whether a given loan is "conforming." The three relevant loan-to-value ratios in Frontenac's Loan Policy are as follows:

 a. Raw land transactions—the loan-to-value must not exceed 65% of the lower of the appraised value or purchase price;

 b. Development of raw ground—the loan-to-value must not exceed 75%

of the lower of the appraised value or cost of land, plus improvement costs;

c. Construction of commercial or other non-residential property— the loan-to-value must not exceed 80% of the lower of the appraised value or construction cost.

viii. The aforementioned loan-to-value ratios in Frontenac's Loan Policy are applicable to the real estate loans that are the subject of Frontenac's Petition.

ix. Based on the evidence presented at trial, each of the loans sued upon by Frontenac fell within the acceptable loan-to-value ratios discussed above, and thus, each loan was "conforming" under Frontenac's Loan Policy.

x. Based on the court's finding that each of the loans sued upon by Frontenac were "conforming" under the Loan Policy, each Borrower was independently creditworthy under Frontenac's own standards of creditworthiness for each of the loans sued upon.

xi. The evidence at trial showed that Frontenac failed to conduct any analysis of the loans sued upon with respect to the Borrowers' creditworthiness prior to requiring Carolyn's guarantees. Frontenac failed to consider whether other, less stringent collateral options were available, such as the pledge of specific assets in lieu of the personal guarantees of Carolyn.

xii. Carolyn has never been a member or manager of Summit.

xiii. Although Carolyn was listed as the Treasurer of Homebuilder on certain annual reports filed with the Secretary of State's office, Carolyn had no involvement with the operations of Homebuilder.

xiv. Frontenac did not demand the guarantees of Carolyn on the basis of any purported relationship she had with Summit or Homebuilder. Rather, the guarantees were demanded solely on the basis that Carolyn was Thomas's wife.

xv. Frontenac has expressly taken the position that Carolyn "offered the guarantees she executed without Frontenac's request.

## 3. Appellate Court Defers to Circuit Court on Factual Findings

After reviewing the circuit court's findings of fact, we next turn to Frontenac's three points on appeal relating to the circuit court's aforementioned factual findings. Frontenac has alleged the circuit court erred in making its findings with respect to Summit and Homebuilder's independent creditworthiness, Carolyn's status as officer, director or owner of the businesses, and Carolyn's offer of personal guarantees to Frontenac. We now address each of these three points individually, noting the applicable standard of review, discussed *supra*.

### A. Borrowers were Independently Creditworthy.

In its third point on appeal, Frontenac contends that the circuit court erred in finding that Summit and Homebuilder were "independently creditworthy" merely because the loans satisfied Frontenac's "loan-to-value" ratios in that "loan-to-value" ratios constitute just one factor in determining creditworthiness. Frontenac argues it presented overwhelming evidence establishing that it considered a host of factors outside of "loan-to-value" ratios in determining creditworthiness, including the need to obtain personal guarantees from both Thomas and Carolyn based on their representations that jointly owned

property and assets could be relied upon by Frontenac as a condition for approval of the loans to Summit and Homebuilder.

Upon reviewing the record, we find Frontenac presented some evidence that it considered other factors in determining a borrower's creditworthiness. In fact, Frontenac's evidence contradicts the circuit court's conclusion. Nonetheless, this is a contested fact and, as such, an appellate court defers to the trial court's determination of credibility. *White,* 321 S.W.3d at 308. This Court, thus, confines itself to determining whether substantial evidence exists to support the trial court's judgment, whether the judgment is against the probative value of the evidence, or whether the trial court erroneously declared or misapplied the law. *Id.*

In addition to the evidence highlighted by Frontenac, we also find in the record evidence of Frontenac's written loan policy. This written policy speaks only of the "loan-to-value" ratios included in the circuit court's findings, and does not include the additional qualifications that Frontenac alleges loan officers were permitted to consider in analyzing a borrower's creditworthiness. This written policy, buttressed by evidence that Frontenac actively sought Borrowers' loan business, and testimony from several Frontenac witnesses that were unaware of any credit analysis of Summit or Homebuilder conducted by Frontenac with respect to each loan, support the circuit court's finding that Summit and Homebuilder were independently creditworthy under the policy. Frontenac is justified in alleging it was permitted to apply its own criteria for determining creditworthiness, as long as it is based on criteria which are valid, reasonable, and non-discriminatory with regard to the applicant's marital status; the evidence here simply established that it did not do so at the time the loans were made. Rather than conducting an analysis of Summit and Homebuilder's creditworthiness, Frontenac deemed the joint financial statement to be an offer by Carolyn to provide her guaranty as well. Frontenac's third point is denied.

## B. Wife was Not an Officer or Director of Borrowers.

 In its fourth point on appeal, Frontenac argues that the circuit court erred by finding that Carolyn was not an officer or director of the businesses whose loans could therefore be secured by Carolyn's personal guarantees in that the ECOA permits a lender to obtain a personal guaranty from an officer, director or owner of a business. Frontenac supports its argument in that the evidence established that Carolyn and her husband submitted documentation to the Missouri Secretary of State and to Frontenac swearing under oath that she was treasurer of Homebuilder and submitted sworn documentation to Frontenac indicating that Carolyn was a member and part owner of Summit.

Evidence was presented at trial that Carolyn was listed as treasurer on the registration reports for Homebuilder. However, this fact was contested when testimony was presented that Carolyn was not involved with Homebuilder's operations or decision-making and that Carolyn was not a shareholder or owner. Evidence also was presented during trial that Frontenac had presented to Thomas a limited liability company borrowing resolution that listed Carolyn as a member of Summit. Thomas testified that although he and his wife signed the document within a whole package of documents, he did not read it and the statement was incorrect. Further, Summit's operating agreement, which Frontenac possessed, showed Carolyn was not a member or manager of Summit. Thomas and Carolyn testified to

the same, and that she was not involved in any decision-making for the business.

Further, Frontenac maintained that it never demanded Carolyn's guarantees on any basis because Carolyn "offered" her guarantees by submitting joint personal financial statements. Additionally, Frontenac's former banking center president and senior vice president Rocco Russo testified that Frontenac routinely required personal guarantees from wives on all similar loans of this size because people "ought to be willing to support it with everything [they] had." He stated that he was unaware of any discussions about requiring Carolyn's guaranty on the basis of her position as an officer of either Borrower.

Based on the contested evidence before the circuit court, we again defer to the circuit court's determinations on credibility and do not re-evaluate the testimony through our own perspective. Here, the record is clear that there is substantial evidence to support the circuit court's judgment when it found that Carolyn was not an officer or director of the businesses. Furthermore, the circuit court's finding that Frontenac did not demand guarantees from Carolyn on the basis of any purported relationship with Summit or Homebuilder, but on the basis that Carolyn was Thomas's wife, also is supported by substantial evidence. In accordance with the ECOA and its regulations, discussed *infra*, the circuit court's judgment is not against the weight of the evidence, and the circuit court did not erroneously declare or misapply the law. Frontenac's fourth point is denied.

## C. Wife did not Voluntarily Offer her Personal Guarantees.

 Finally, in its fifth point, Frontenac alleges the circuit court erred in finding that Carolyn did not voluntarily offer her personal guarantees to Frontenac as security for loans to businesses owned by Carolyn and her husband in that under Missouri law, an unambiguous writing may not be impeached by parol evidence. Frontenac argues, in this case, all of the written documentation signed by Carolyn established that the Borrowers and the Hughes offered Carolyn's personal guarantees to Frontenac as additional security for the business loans, which written documentation included the face pages of Carolyn's personal guarantees that expressly provided that "this guaranty is executed at borrower's request and not at the request of the lender," and reflected the fact that Carolyn fully recognized and understood that she and Borrowers were offering the personal guarantees to Frontenac and that Frontenac was relying on Carolyn's personal guarantees and jointly owned assets to satisfy the business loans extended by Frontenac.

Evidence was presented that in each commercial guaranty signed by Carolyn, a section entitled "Guarantor's Representations and Warranties" stated that the "Guarantor represents and warrants to Lender that ... (B) this Guaranty is executed at Borrower's request and not at the request of Lender. . . ." Further, Frontenac argues that the portion of the personal financial statements submitted on a form obtained from another financial institution should be construed as a voluntary offer to personally guaranty the companies' loans. The relevant portion of the financial statements states that the information contained within the personal financial statement is provided to "induce you [the lender, i.e. Frontenac] to extend or to continue the extension of credit to the undersigned or to others upon the guaranty of the undersigned." The form also directs the applicant who is relying on the income or assets of another person as

the basis of repayment of the credit requested to complete all sections of the form. Frontenac argues that the circuit court's finding ignores these written statements and the parol evidence rule. We disagree.

To contest the specific facts regarding the voluntariness of Carolyn's personal guarantees, Carolyn testified at trial that she never offered her guarantees, but that she only signed what Thomas asked her to sign as a condition for his obtaining the loans. Thomas also testified that Carolyn did not offer the guarantees, but that Frontenac required them. Additional testimony from Frontenac's past president and senior vice president Mr. Russo provided that Frontenac's common practice was to deem a joint financial statement as a joint application for credit, and, "[w]ithout a doubt," Frontenac did so here. Russo testified that Frontenac routinely required personal guarantees from wives on loans of similar size because the bank would otherwise question why they were not willing to "step up" if they wanted the money lent. Moreover, a review of the personal financial statements reveals that the pre-printed form language, used by Frontenac to support Carolyn's voluntary offer of personal guarantees, includes an unchecked box in front of it, indicating she did not agree to those terms.

Frontenac argues that the court should eliminate the evidence outside of the written guarantees based on the parol evidence rule. However, "[t]he rule which forbids the introduction of parol evidence to contradict, add to, or vary, a written instrument does not extend to evidence offered to show that a contract was made in furtherance of objects forbidden by statute, by the common law, or by the general policy of the law. Evidence of an illegal agreement with which the contract in suit is directly connected is competent evidence." *Murray v. Murray*, 293 S.W.2d 436, 441 (Mo.1956) (quoting 17 C.J.S., Contracts, § 596, p. 1242).

Accordingly, we find the circuit court had substantial evidence in the record upon which to base its findings related to Carolyn's involuntary offer of personal guarantees. The circuit court's findings were not against the weight of the evidence, nor did they erroneously declare or misapply the law. Frontenac's fifth point is denied.

## 4. Wife's Personal Guarantees are Void under the ECOA.

Next, we turn to Frontenac's points on appeal raising questions of law under the ECOA. Based on our *de novo* review, we disagree with each of Frontenac's points in that the circuit court did not erroneously declare or misapply the law.

### A. State Property Law Fails to Provide Exception to ECOA Violation.

In its Point I on appeal, Frontenac alleges the circuit court erred in declaring Carolyn's personal guarantees null and void under the ECOA because the ECOA and its regulations recognize that in a "tenants by the entireties" state like Missouri, a lender may require the personal guaranty of a spouse jointly owning property with his or her spouse as tenants by the entireties since the joint owner spouse's signature is necessary for the creditor to reach the joint property and joint assets being relied upon by the borrower/guarantor spouse. Frontenac further contends, that, in this case, Thomas presented a personal financial statement signed by his wife reflecting assets jointly owned with Carolyn, which Frontenac relied on to support Thomas's personal guarantees and which jointly owned assets were used by Thomas as a substantial

inducement for Frontenac to make various loans to Thomas and his business.

In arguing this point, Frontenac bootstraps three of its arguments regarding the circuit court's factual determinations as not supported by substantial evidence and against the weight of the evidence. These claimed errors have been expelled by this Court, as discussed in Points III, IV, and V, *supra.* Nevertheless, Frontenac claims that in reaching its finding that Frontenac required Carolyn to provide personal guarantees solely because she was the wife of Thomas, the circuit court misconstrued the ECOA. We disagree.

Under the ECOA, it is unlawful for any creditor to discriminate against a credit applicant "with respect to any aspect of a credit transaction ... on the basis of ... marital status." 15 U.S.C. § 1691(a)(1). Additionally, "Regulation B," promulgated under the ECOA by the Federal Reserve System's board of governors, provides that a creditor

> shall not require the signature of an applicant's spouse or other person, other than a joint applicant, on any credit instrument if the applicant qualifies under the creditor's standards of creditworthiness for the amount and terms of credit requested. A creditor shall not deem the submission of a joint financial statement or other evidence of jointly held assets as an application for joint credit.

12 C.F.R. § 202.7(d)(1). The Missouri Supreme Court has affirmed the same. *Boone Nat'l Sav. & Loan Assoc., F.A. v. Crouch,* 47 S.W.3d 371, 373 (Mo. banc 2001).

Regulation B further guides creditors on its exceptions:

> Secured credit. If an applicant requests secured credit, a creditor may require the signature of the applicant's spouse or other person on any instrument nec-

essary, or reasonably believed by the creditor to be necessary, under applicable state law to make the property being offered as security available to satisfy the debt in the event of default, for example, an instrument to create a valid lien, pass clear title, waive inchoate rights, or assign earnings.

12 C.F.R. § 202.7(d)(4).

In interpreting this exception, the United States Bankruptcy Court for the Eastern District of Tennessee recently determined that, in a "tenants by the entireties" state, where a limited guaranty was required of a debtor's wife and did not extend beyond her interest in the property securing the debtor's unconditional guaranty to secure his loan, the limited guaranty and related mortgage deed fell within the exception of Regulation B, 12 C.F.R. § 202.7(d)(4). *In re Huston,* 2010 WL 4607823, *1, *3 (Bankr.E.D.Tenn.2010). In *Huston,* the wife's guaranty was limited to her interest in a Florida property she jointly owned as tenants by the entirety with her husband, the debtor. *Id.* at *2. The guaranty was secured with a mortgage deed on the Florida property. *Id.* The court found that the method used to obtain an interest in the real property offered as collateral was proper under Florida law. *Id.*

■ *In re Huston* guides us in determining whether Carolyn's unlimited personal guarantees fall within this Regulation B, 12 C.F.R. § 202.7(d)(4), exception regarding state law, and specifically, Missouri's tenants by the entireties law. We find the *unlimited* personal guaranty Frontenac required from Carolyn here is more than a financial instrument necessary to make property being offered as security available to satisfy a debt upon default, as the exception in Regulation B describes. *Id.* at *2. Neither *In re Huston* nor the

regulation provide for such a broad relinquishment of rights from a spouse or other joint owner in order to make the property available to satisfy a debt to Frontenac.

Substantial evidence supports the circuit court's finding that Frontenac failed to conduct any analysis of the Borrowers' creditworthiness, but that they nonetheless met Frontenac's Loan Policy standards of creditworthiness. Notwithstanding the fact that Frontenac could have relied solely on the creditworthiness of Borrowers rather than Thomas, Frontenac deemed Thomas's personal financial statements reflecting joint ownership as a submission to personal guarantees by him and his wife. This seemed to be common practice by Frontenac in its treatment of requiring the guarantees by wives on all large loans. Evidence was further presented demonstrating that Frontenac failed to consider whether less stringent collateral options were available to secure the loans without unlimited personal guarantees. In exceeding the limits set forth in Regulation B's exception to the rule against requiring an applicant's spouse to sign a credit instrument if the applicant qualifies alone under the creditor's standards of creditworthiness, Frontenac clearly violated the ECOA. The circuit court did not misapply the law. *Frontenac's first point is denied.*

## B. Borrowers were Independently Creditworthy.

 In its Point II, Frontenac alleges that the ECOA does not prohibit a spouse from providing a personal guaranty where his or her applicant/guarantor spouse is not "independently creditworthy," and in this case, there was no evidence presented by Carolyn and no finding by the court that Carolyn's husband, Thomas, was independently creditworthy. This absence, Frontenac argues, fully supported Frontenac's position that it was permitted to obtain personal guarantees from Carolyn, as well as her husband, as additional security for more than $5 million in business loans without violating the ECOA.

Regulation B, 12 C.F.R. § 202.7(d)(5) provides:

If, under a creditor's standards of creditworthiness, the personal liability of an additional party is necessary to support the credit requested, a creditor may request a cosigner, guarantor, endorser, or similar party. The applicant's spouse may serve as an additional party, but the creditor shall not require that the spouse be the additional party.

12 C.F.R. § 202.7(d)(5).

As discussed in Point III, *supra*, the circuit court did not err in finding substantial evidence on the record to support its finding that loan applicants Summit and Homebuilder were independently creditworthy based on Frontenac's own standards of creditworthiness, specifically the loan-to-value ratios found in Frontenac's written loan policy. Based on such finding, the inquiry properly stopped there and never turned to the creditworthiness of Thomas. Thus, Section 202.7(d)(5)'s provision allowing a creditor to request a spouse to act as Thomas's cosigner, guarantor or endorser was not triggered. Instead, Section 202.7(d)(1) applies, providing that a creditor shall not deem the submission of a joint financial statement or other evidence of jointly held assets as an application for joint credit. The circuit court did not err in finding that Frontenac deemed Thomas's submission of the joint statements as an application for joint credit, in direct violation of the ECOA. *Frontenac's second point is denied.*

## C. Boone National Savings and Loan Assoc. is not Overruled.

 In its sixth and final point, Frontenac contends the circuit court erred

in declaring Carolyn's personal guarantees null and void under the ECOA, where a number of federal cases decided since the Missouri Supreme Court's decision in *Boone National Savings and Loan Assoc. v. Crouch*, 47 S.W.3d at 371, have rejected the extension of the ECOA and its governing regulations to spousal guarantees as being in excess of regulatory authority based on the express language in the Act and in this case, the circuit court relied solely on *Boone National Savings and Loan Assoc.* and ignored this more recent federal law in voiding Carolyn's personal guaranty as violating the ECOA.

In *Boone National Savings & Loan Assoc.*, the Missouri Supreme Court held that the ECOA could be asserted as an affirmative defense by a wife in a creditor's claim to enforce a guaranty. 47 S.W.3d at 371. Frontenac argues that since then, there has not been a single reported case in Missouri where a spousal guaranty has been invalidated under the ECOA, and that various federal cases have held Regulation B does not apply to spousal guarantees. *See Moran Foods, Inc. v. Mid–Atlantic Market Dev. Co., LLC*, 476 F.3d 436, 441 (7th Cir.2007) (holding a guarantor is not an "applicant" entitled to ECOA protections).

"Applicant" is defined under the ECOA as "any person who applies to a creditor directly for an extension of credit, or applies to a creditor indirectly by use of an existing credit plan for an amount exceeding a previously established credit limit." 15 U.S.C. § 1691a(b); *Bank of the West v. Kline*, 782 N.W.2d 453, 457 (Iowa 2010). In further analyzing the definition of "applicant," we look again to Regulation B, which carries out the provisions of the ECOA. Under Regulation B, "applicant" means

any person who requests or who has received an extension of credit from a creditor, and includes any person who is or may become contractually liable regarding an extension of credit. For purposes of § 202.7(d), the term includes guarantors, sureties, endorsers, and similar parties.

12 C.F.R. § 202.2(e).

Without reason why this Court should abandon the doctrine of *stare decisis*, we follow the binding Missouri precedent in *Boone National Savings & Loan Assoc. v. Crouch*, 47 S.W.3d at 373. Accordingly, Carolyn is protected by the ECOA as a guarantor of the loans at issue in this case. We find the circuit court did not err in declaring Carolyn's personal guarantees null and void under the ECOA based on the Missouri Supreme Court's ruling in *Boone National Savings & Loan Assoc.* Frontenac's sixth point is denied.

## III. CONCLUSION

The judgment of the circuit court is reversed and remanded for further proceedings regarding the circuit court's ruling of summary judgment in favor of Frontenac on its claims arising from certain loan agreements, including promissory notes and guaranty agreements with Defendants. The judgment of the circuit court is affirmed with respect to its ruling in favor of Carolyn and against Frontenac based on the Carolyn's ECOA affirmative defense on Counts VI, IX, XIII, and XVI of Frontenac's Petition.

ROBERT G. DOWD, JR. and ANGELA T. QUIGLESS, JJ., concur.