FRONTENAC BANK, Respondent,

v.

GB INVESTMENTS, LLC, and Gil
G. Bashani, Appellants.

No. ED 104163

Missouri Court of Appeals,
Eastern District,
DIVISION ONE.

Filed May 9, 2017

Motion for Rehearing and/or Transfer
to Supreme Court Denied June
22, 2017

Motion for Transfer to Supreme Court
Denied October 5, 2017

Lawrence E. Parres, David E. Horan, Jeremy P. Brummond, St. Louis, MO, for Respondent.

Christopher S. Swiecicki, Chesterfield, MO, for Appellant.

ROBERT M. CLAYTON, III, Presiding Judge

GB Investments, LLC (individually "GB Investments") and Gil G. Bashani (individually "Bashani") (collectively "Defendants") appeal the order striking their pleadings as a discovery sanction. Defendants also appeal the judgment, entered after a bench trial, in favor of Frontenac Bank ("the Bank") on the Bank's action on a promissory note against GB Investments and the Bank's action on a guaranty against Bashani. We affirm.[1]

## I. BACKGROUND

On March 17, 2004, GB Investments executed a promissory note with the Bank for $433,500.00, and the original note was modified and restated several times (collectively "Note"). The Note was secured by a deed of trust on real property commonly known as 9974 Old Olive Street Road, St. Louis, Missouri 63141 ("the Property"). The Note includes provisions requiring GB Investments to pay the Bank's attorneys' fees incurred in connection with efforts to collect amounts under the Note.

On April 19, 2010, Bashani, the managing member of GB Investments, executed a guaranty, whereby he personally guaranteed all obligations and indebtedness then existing or thereafter created by GB Investments in favor of the Bank, including the obligations referenced in the Note ("Guaranty"). The Guaranty, like the Note, includes a provision that gives the Bank the right to collect attorneys' fees incurred in connection with enforcing the Guaranty.

1. The Bank has filed a motion for attorneys' fees on appeal, which has been taken with the case. For the reasons discussed below in Section II.C.3., we grant the Bank's motion in the amount of $20,000.00.

On January 30, 2014, the Note matured pursuant to its terms, and the total amount (a total of $437,653.90 in principal and interest) became due. After Defendants failed to pay that amount pursuant to the Note and Guaranty, the Bank foreclosed on the Property pursuant to its rights under the terms of the deed of trust. FB–Realty, LLC, a wholly-owned subsidiary of the Bank, purchased the Property at the foreclosure sale for $325,000.00.

## A. The Bank's Petition and Defendants' Responsive Pleadings

After the foreclosure sale, the Bank filed a two-count petition against Defendants on May 19, 2014. Count I is an action against GB Investments seeking recovery under the Note, and Count II is an action against Bashani seeking recovery under the Guaranty. The Bank's petition requested a judgment against Defendants, (1) for damages in the amount of $112,653.90 (the total amount of $437,653.90 due under the Note minus the foreclosure sale price of $325,000.00); and (2) for attorneys' fees and legal expenses incurred by the Bank in connection with its efforts to collect the amounts due under the Note and in connection with enforcement of the Guaranty.

In response to the Bank's petition, Defendants' counsel, Eugene Trams,[2] filed an answer, an affirmative defense of failure to state a claim, and three counterclaims on behalf of Defendants. Defendants' counterclaims against the Bank were for breach of contract, fraudulent misrepresentation, and negligent misrepresentation, and they sought damages in excess of $260,000.00.

The breach of contract counterclaim alleged the Bank breached an agreement to renew the Note, delayed the Note renewal process, and failed to provide sufficient time for Defendants to secure substitute financing. In addition, Defendants' fraudulent and negligent misrepresentation counterclaims related to statements made by the Bank and its regional president David Webb regarding Note renewal.[3]

After Defendants filed their responsive pleadings, the trial court scheduled the case for trial on February 18, 2016.

## B. Procedural Posture Relating to the Discovery Process

On August 19, 2015, the Bank served its first request for production of documents and its first set of interrogatories upon Defendants. Responses to the Bank's initial discovery request were due on September 21, 2015.

### 1. Defendants' Failure to Timely and Adequately Provide Discovery Responses

After the Bank did not receive timely discovery responses from Defendants, the Bank's counsel sent Defendants' counsel a letter on September 25, 2015, explaining that the Bank would seek action from the trial court if responses were not received by September 30.

On October 8, the Bank filed its first motion to compel against Defendants, alleging it had still not received any discovery responses from Defendants. The Bank's motion requested the trial court to, *inter alia*, enter an order directing Defen-

---

**2.** Trams entered his appearance for Defendants in July 2014. As discussed below, the record reflects Trams was involved in the representation of Defendants though December 2015 and that new counsel entered his appearance for Defendants in February 2016. Unless otherwise indicated, all further references to Defendants' counsel are to Trams.

**3.** Defendants initially asserted third-party claims against Webb arising out of the same statements, but Defendants later agreed to dismiss those claims in response to a motion to dismiss filed by Webb's counsel.

dants to provide discovery responses and striking Defendants' pleadings. However, the trial court did not enter a ruling on the Bank's first motion to compel.

On October 21, the Bank received discovery responses from Defendants, which the Bank alleged were "completely lacking," "incomplete," and "objectionable." By letter dated November 16, the Bank's counsel informed Defendants' counsel of the specific deficiencies in the Defendants' discovery responses. The Bank received supplemental discovery responses from Defendants on November 30, 2015, which the Bank alleged "again proved to be incomplete and lacking."

### 2. The Bank's Second Motion to Compel

On January 4, 2016, the Bank filed a second motion to compel against Defendants. The motion was based upon Defendants' failure to timely and adequately provide discovery responses as set out in the previous subsection. The motion also alleged the following issues occurred with respect to three of Bashani's scheduled depositions, which were to be conducted on behalf of himself and Defendant GB Investments.

Bashani's first deposition was scheduled for the morning of Tuesday, December 1, 2015. However, on Monday, November 30, at 4:34 p.m., the Bank's counsel received an email notice from Defendants' counsel informing the Bank that Bashani would not be appearing at the deposition. According to Defendants' counsel, the canceling of the deposition was caused by Bashani and not any failure on the part of Defendants' counsel; an email sent by Defendants' counsel to the Bank's counsel on December 1st states Bashani "was unreachable, and then dumped th[e] news on [Defendants' counsel] late yesterday." The parties' agreed to continue the deposition to Friday, December 4.

Bashani and Defendants' counsel both appeared at the December 4 deposition. During the deposition, Bashani continuously referred to documents that he had access to, but which had not been produced to the Bank during discovery. Accordingly, the parties agreed to continue the December 4 deposition until December 11 to allow Defendants and their counsel time to produce the documents to which Bashani referred to in his deposition testimony. Defendants' counsel told the Bank's counsel he would get him the documents prior to the rescheduled December 11 deposition. However, Defendants' counsel did not ever provide any documents to the Bank. In addition, Defendants and their counsel failed to appear at the rescheduled December 11 deposition, and they did not send or have any communication with the Bank's counsel informing the Bank that they did not intend to appear. Furthermore, the record reflects Defendants' counsel's appearance and representation of Defendants at the December 4 deposition is the last action counsel took on behalf of Defendants.

The Bank's second motion to compel alleged, "Defendants' conduct is outrageous and is prohibiting the Bank from preparing its case for the February 18, 2016 trial and to defend against the counterclaims filed against the Bank by the Defendants." In addition, the Bank's motion requested the court to, *inter alia*, enter an order striking Defendants' pleadings, including their counterclaims against the Bank.

### C. The Trial Court's Order Striking Defendants' Pleadings, the Entry of Appearance of Defendants' New Counsel, and Defendants' Motion for Reconsideration

On January 27, 2016, the trial court held a hearing on the Bank's second motion to

compel. On that same date, the court entered an order granting the Bank's motion and striking Defendants' pleadings, including their counterclaims. The trial court's order states in relevant part:

> ... Counsel for [the Bank] appears. Counsel for [Defendants] fails to appear or otherwise contact the court. This matter was set at 9 a.m. The [c]ourt called the number listed for [Defendants'] counsel (on the MO Bar web site) and left a message, requesting that counsel contact the [c]ourt. This was at 9:35 a.m. No response. The [c]ourt notes that counsel for [Defendants] set today's hearing for [a] status conference. Further, this matter is set for trial on February 18, 2016 at 9 a.m. The [c]ourt expects to proceed with trial on that date, with or without [Defendants].

> Before the [c]ourt today is [the Bank's] second motion to compel discovery responses and for sanction[s]. The [c]ourt takes judicial notice of its file, including but not limited to the allegations in the motion before the [c]ourt today (along with attached exhibits). The [c]ourt finds that it has no choice but to grant the relief requested by [the Bank], especially given the failure of counsel for the [D]efendant[s] to communicate with the [c]ourt in any fashion at all. Motion to strike the pleadings of [Defendants] and [their] counterclaims is granted. The court reserves ruling on the motion of [the Bank] for attorneys' fees and costs, given that this matter is set for trial in the near future.

On February 5, 2016, Defendants' new counsel, Christopher Swiecicki, entered his appearance for Defendants. On that same date, Swiecicki, on behalf of Defendants, filed an unverified motion for reconsideration of the trial court's order striking Defendants' pleadings. No exhibits, including any statement or affidavit by Bashani, are attached to Defendants' motion. Instead, Defendants' motion simply makes bare allegations regarding their interaction (or lack thereof) with their former counsel, Trams. The trial court subsequently denied Defendants' motion for reconsideration.

### D. The Bench Trial and the Trial Court's Judgment

On February 18, 2016, the trial court held a bench trial on the Bank's action on the Note against GB Investments and the Bank's action on the Guaranty against Bashani.[4] Counsel for the Bank and counsel for Defendants (Swiecicki) appeared at the trial. Because Defendants' pleadings had been stricken, the focus of the trial was on the Bank's damages and attorneys' fees. In support of its claim, the Bank presented testimony of its general counsel, David Wulkopf, in the form of an affidavit and live testimony. Attached to Wulkopf's affidavit are exhibits including the Note, the Guaranty, and bills the Bank had received for attorneys' fees.

Wulkopf testified that after the Bank foreclosed on the Property pursuant to its rights under the terms of the deed of trust, FB–Realty, LLC, a wholly-owned subsidiary of the Bank, purchased the Property at a foreclosure sale for $325,000.00. Wulkopf also testified that

---

4. The Bank filed a motion to strike Defendants' jury trial demand. The trial court held a hearing on the motion on February 18, 2016, and counsel for the Bank and counsel for Defendants (Swiecicki) appeared at the hearing. On that same date, the trial court entered an order granting the Bank's motion and striking Defendants' jury trial demand, finding "each of the Defendants waived their right to a jury trial pursuant to the loan documents executed by each of the Defendants in this case." Defendants do not challenge this order on appeal.

sometime after the purchase at the foreclosure sale, FB–Realty, LLC sold the Property. When counsel for Defendants (Swiecicki) asked Wulkopf if the Bank received $425,000.00 from the post-foreclosure sale, Wulkopf replied, "We did sell the [P]roperty. I'm not—I don't have the contract, I was not prepared for that so I don't know the exact purchase price or sale price." [5]

Wulkopf indicated during his testimony that the Bank was requesting a judgment against the Defendants in the total amount of $188,319.96, which consisted of damages and attorneys' fees. Defendants' counsel (Swiecicki) cross-examined Wulkopf as to the requested amount of damages and attorneys' fees.

After the bench trial, the trial court entered a judgment in favor of the Bank in the amount of $188,319.96. Consistent with Wulkopf's testimony and the Bank's bills for attorneys' fees, that figure represented the sum of, (1) $116,894.18 in damages, which was the amount of principal, accrued interest, and accrued charges due and outstanding under the Note, after applying all credits including the $325,000.00 foreclosure sale price of the Property; and (2) $71,425.78 in attorneys' fees, which was the amount of fees the Bank incurred during the proceedings before the trial court, including some fees the Bank incurred in defending the Defendants' counterclaims. Defendants appeal.[6]

## II. DISCUSSION

Defendants raise three points on appeal. In their first point, Defendants argue the trial court erred in entering the order striking Defendants' pleadings as a discovery sanction. In their second point, Defendants assert the trial court erred in awarding the Bank attorneys' fees it incurred in defending Defendants' counterclaims. And in their third point, Defendants contend the trial court's judgment erroneously calculates the Bank's damages.

In addition, the Bank has filed a motion for attorneys' fees on appeal, which has been taken with the case.

### A. General Standard of Review

■ In reviewing a court-tried case, our Court will affirm the trial court's decision unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law. *Scheck Indus. Corp. v. Tarlton Corp.*, 435 S.W.3d 705, 717 (Mo. App. E.D. 2014); *Ferguson v. Strutton*, 302 S.W.3d 239, 243 (Mo. App. S.D. 2009). We view the evidence and all reasonable inferences therefrom in the light most favorable to the trial court's decision, and we disregard all contrary evidence and inferences. *Scheck Indus. Corp.*, 435 S.W.3d at 717.

In addition, this Court presumes the trial court's decision is valid, and the burden is on the complaining party to demonstrate it is incorrect. *Id.* Furthermore, we may affirm the trial court's decision for any reason supported by the record. *Ferguson*, 302 S.W.3d at 243 (citing *Koehr v. Emmons*, 55 S.W.3d 859, 862 (Mo. App. E.D. 2001)).

### B. The Trial Court's Order Striking Defendants' Pleadings as a Discovery Sanction

■ In their first point on appeal, Defendants argue the trial court erred in

---

5. We note that despite Wulkopf's testimony, the Bank concedes in its brief on appeal that, after the foreclosure sale, the Property "was resold some months later for $425,000.00." Accordingly, for purposes of this appeal only, we find that months after the foreclosure sale, FB–Realty, LLC sold the Property for $425,000.00.

6. Additional facts relevant to each point on appeal will be set forth below in Sections II.B., II.C., and II.D.

entering the order striking Defendants' pleadings as a discovery sanction.[7]

### 1. Standard of Review and General Law

A trial court has broad discretion in administering the rules of discovery and in determining the proper remedy—including sanctions—for a party's non-compliance with the rules of discovery. *Lambrich v. Kay*, 507 S.W.3d 66, 75 (Mo. App. E.D. 2016); *Anderson v. Arrow Trucking Co.*, 181 S.W.3d 185, 188 (Mo. App. W.D. 2005). Our review of the trial court's imposition of a discovery sanction "is limited to determining whether the trial court could have reasonably concluded as it did, not whether the reviewing court would have imposed the same sanctions under the same circumstances." *Ferguson*, 302 S.W.3d at 244 and *Anderson*, 181 S.W.3d at 189 (quotations omitted). In addition, an appellate court will not interfere with the trial court's decision to impose sanctions unless the trial court clearly has abused its discretion. *Anderson*, 181 S.W.3d at 189. A trial court abuses its discretion only if its decision "is clearly against the logic of the circumstance[s], is arbitrary and unreasonable, and indicates a lack of careful consideration." *Lambrich*, 507 S.W.3d at 75; *see Anderson*, 181 S.W.3d at 189.

Rule 61.01[8] gives a trial court significant discretion to impose sanctions that are "just" when a party fails to answer interrogatories, gives an evasive or incomplete answer to interrogatories, fails to produce documents, or fails to attend depositions. *Holm v. Wells Fargo Home Mortgage, Inc.*, 514 S.W.3d 590, 596–97, 2017 WL 770979 at *4 (Mo. banc Feb. 28, 2017) (case mandated on Apr. 25, 2017) (citing Rule 61.01(b), (d), and (f)); *see* Rule 61.01(a) (treating an evasive or incomplete answer as a failure to answer interrogatories). "The rule expressly contemplates that a trial court may, in its discretion, sanction a party for such misconduct by striking pleadings," despite the fact that Missouri Courts have considered striking a party's pleadings to be a harsh penalty. *Id.*; *see* Rule 61.01(b)(1), (d)(2), and (f); *see, e.g., Binder v. Thorne–Binder*, 186 S.W.3d 864, 868 (Mo. App. W.D. 2006).

Furthermore, an order striking a party's pleadings is justified and does not constitute an abuse of discretion where the record sufficiently shows, (1) the disobedient party engaged in a pattern of repeated disregard of the obligation to comply with the rules of discovery,[9] i.e., the party has demonstrated a contumacious and deliberate disregard for authority of the trial court; and (2) the opposing party was prejudiced thereby. *Stockmann v. Frank*, 239 S.W.3d 650, 656 (Mo. App. E.D. 2007); *Scott v. LeClercq*, 136 S.W.3d 183, 190–92 (Mo. App. W.D. 2004); *Norber v. Marcotte*, 134 S.W.3d 651, 659–61 (Mo. App. E.D. 2004); *Dobbs v. Dobbs Tire & Auto Centers, Inc.*, 969 S.W.2d 894, 899 (Mo. App. E.D. 1998); *see S.R. v. K.M.*,

---

7. We note that a trial court's order imposing sanctions is not in and of itself a final and appealable judgment. *Buemi v. Kerckhoff*, 359 S.W.3d 16, 20–25 (Mo. banc 2011). However, a party wishing to challenge the imposition of sanctions is able to have the trial court's order reviewed by an appellate court by either, (1) appealing the order after a final judgment is entered on the underlying claims, as Defendants have done in this case; or (2) seeking a writ of prohibition before a final judgment is entered, when appropriate. *Id.* at 25.

8. All references to Rules are to Missouri Supreme Court Rules (2016).

9. We note that "an order striking pleadings ... against a disobedient party can be made without a violation of a court order." *Sher v. Chand*, 889 S.W.2d 79, 82 (Mo. App. E.D. 1994).

115 S.W.3d 862, 865 (Mo. App. E.D. 2003); *see also Binder*, 186 S.W.3d at 867 (finding the trial court is not required to make a specific finding as to either prong). We now turn to whether the trial court's order striking Defendants' pleadings meets the aforementioned two-prong test.

**2. Whether Defendants Engaged in a Pattern of Repeated Disregard of the Obligation to Comply with the Rules of Discovery**

We first examine whether the record sufficiently shows Defendants engaged in a pattern of repeated disregard of the obligation to comply with the rules of discovery. *See id.*

### a. The Defendants' Repeated Violations of Rule 61.01

In this case, the record shows Defendants repeatedly violated Rule 61.01 by: initially failing to answer interrogatories; giving evasive or incomplete answers to interrogatories; failing to produce documents; and failing to attend a deposition. *See Holm*, 514 S.W.3d at 596–97, 2017 WL 770979 at *4 (citing Rule 61.01(b), (d), (f)); Rule 61.01(a).

First, Defendants initially failed to answer interrogatories and failed to produce documents in violation of Rule 61.01(b) and (d). While responses to the Bank's first request for production of documents and its first set of interrogatories were due on September 21, 2015, the Bank did not receive any discovery responses from Defendants until October 21, which was after the Bank filed its first motion to compel.

Then, Defendants' discovery responses gave evasive or incomplete answers to interrogatories and failed to produce documents, in violation of Rule 61.01(a), (b), and (d). The Bank alleged Defendants' October 21 discovery responses were "completely lacking," "incomplete," and "objec-tionable." By letter dated November 16, the Bank's counsel informed Defendants' counsel of the specific deficiencies in the Defendants' October 21 discovery responses, including the following. First, Defendants' responses to Interrogatory Request Nos. 5, 10, and 11, some of which pertained to Defendants' counterclaims against the Bank, only stated Defendants were not required to write out oral communications. Second, GB Investments failed to respond at all to Interrogatory Request No. 6, by not even listing the question on its response. Third, Bashani's responses to Production Request Nos. 2, 11, and 12 directed the Bank to documents allegedly produced under Production Request No. 1, but there were no documents produced under Request No. 1. Finally, Bashani's responses to Production Request Nos. 4, 5, 6, and 7 only stated that some unidentified documents were produced to the Bank at some unknown time. The Bank received supplemental discovery responses from Defendants on November 30, 2015, which the Bank alleged "again proved to be incomplete and lacking."

Subsequently, the events that transpired with respect to two of Bashani's scheduled depositions on December 4 and 11, which were to be conducted on behalf of himself and Defendant GB Investments, show Defendants again failed to produce documents in violation of Rule 61.01(d) and that Bashani failed to attend the deposition on December 11 in violation of Rule 61.01(f). Although Bashani appeared at his December 4 deposition, he continuously referred to documents that he had access to, but which had not been produced to the Bank during discovery. Accordingly, the parties agreed to continue the December 4 deposition until December 11 to allow Defendants and their counsel time to produce the documents to which Bashani referred to in his deposition testimony. Defendants' counsel told the Bank's coun-

sel he would get him the documents prior to the rescheduled December 11 deposition. However, Defendants' counsel did not ever provide any documents to the Bank. In addition, Defendants and their counsel failed to appear at the rescheduled December 11 deposition, and they did not send or have any communication with the Bank's counsel informing the Bank that they did not intend to appear.

Because Defendants violated Rule 61.01 time after time from September through December 2015, under circumstances where the parties' trial was set for February 2016, we find the record sufficiently shows Defendants engaged in a pattern of repeated disregard of the obligation to comply with the rules of discovery.

### b. Defendants' Argument Regarding Their Former Counsel (Trams)

Defendants argue the above discovery violations should not be imputed to them because they only arose from their former counsel's actions and alleged abandonment. In support of their argument, Defendants rely on, (i) their motion for reconsideration of the trial court's order striking Defendants' pleadings; and (ii) case law providing that an attorney's neglect, but not his abandonment, will be imputed to his clients.

### i. Defendants' Motion for Reconsideration

Defendants' motion for reconsideration of the trial court's order striking Defendants' pleadings is unverified, and no exhibits, including any statement or affidavit by Bashani, are attached to the motion.

Instead, Defendants' motion simply makes bare allegations regarding their interaction (or lack thereof) with their former counsel, Trams, including the following, (1) Bashani was under the assumption that Trams was handling all discovery requests, would make any needed objections, and would contact Bashani if any more documents were required; (2) it was Bashani's understanding via Trams that the Bank would provide formal notification of the rescheduled December 11 deposition and Trams would inform Bashani if his presence was required on that date, but Bashani did not receive any such notification by either the Bank or Trams; (3) Bashani had not heard from Trams "since at least December 26, 2015"; and (4) "Bashani d[id] not know why [Trams] ceased all contact with him, [the Bank] or the [c]ourt."

"Generally, a motion for reconsideration has no legal effect because no Missouri rule provides for such a motion." *Hinton v. Proctor & Schwartz, Inc.*, 99 S.W.3d 454, 459 (Mo. App. E.D. 2003). However, in order that an appellant not be denied substantive review of an appeal, our Court has treated a motion for reconsideration as a motion for new trial if, as in this case, it is timely filed.[10] *Id.*

The movant has the burden of proving allegations it makes in a motion for new trial. *Smith v. Brown & Williamson Tobacco Corp.*, 410 S.W.3d 623, 639 (Mo. banc 2013). Mere allegations concerning factual matters in a motion for new trial are not evidence and are not self-proving. *Reno v. Reno*, 461 S.W.3d 860, 866 (Mo. App. W.D. 2015); *see also* 17 Mo. Practice Series section 78.05:1 (December

---

**10.** Rule 78.04 provides in relevant part: "Any motion for new trial ... shall be filed no later than thirty days after the entry of judgment." In this case, Defendants' motion for reconsideration was filed on February 5, 2016, nine days after the trial court's January 27 order striking Defendants' pleadings. Therefore, Defendants' motion for reconsideration is considered timely filed and we treat it as we would a motion for new trial. *See Hinton*, 99 S.W.3d at 459.

2016 update) ("[f]actual matters in motions are not self-proving; mere allegations are insufficient"). Instead, when allegations in an appellant's motion for new trial are based on matters outside the record, the burden is on the appellant to provide evidence, such as an affidavit or other document that is otherwise verified or self-proving, to support the allegations. *Downing v. Howe*, 60 S.W.3d 646, 649 (Mo. App. S.D. 2001); *VonSande v. VonSande*, 858 S.W.2d 233, 236 (Mo. App. S.D. 1993); *see Tuffli v. Board of Educ. of Wentzville R-4 School Dist.*, 643 S.W.2d 296, 298 (Mo. App. E.D. 1982) (finding that the trial court was justified in denying appellant's motion for new trial because the motion was unverified and not supported by affidavits or testimony).

In this case, the allegations in Defendants' unverified motion for reconsideration concern factual matters outside the record, are not evidence, and are not self-proving. *See Reno*, 461 S.W.3d at 866; 17 Mo. Practice Series section 78.05:1 (December 2016 update); *Downing*, 60 S.W.3d at 649; *VonSande*, 858 S.W.2d at 236. Furthermore, Defendants' motion contains only bare allegations. Because the motion was unverified, and no exhibits, including any statement or affidavit by Bashani, are attached to the motion, we find Defendants have not met their burden of providing evidence to support and prove the allegations in the motion for reconsideration regarding Defendants' interaction (or lack thereof) with their former counsel, Trams. *See Smith*, 410 S.W.3d at 639; *Downing*, 60 S.W.3d at 649; *VonSande*, 858 S.W.2d at 236. Accordingly, our Court will not consider the bare allegations in Defendants' motion for reconsideration in this appeal. Instead, in determining whether discovery violations should be imputed to Defendants, we will only consider the applicable case law on an attorney's neglect versus abandonment and the evidence in the record before us.

## ii. The Applicable Case Law on an Attorney's Neglect Versus Abandonment and the Evidence in the Record in this Case

The Missouri Supreme Court has held: Generally, actions of a party's attorney, including procedural neglect that precludes a client's substantive rights, are imputed to the client. The rule attributing an attorney's neglect to the party is a harsh rule .... The consequence of not imputing the neglect to the party, however, is to excuse the attorney of professional negligence, an excuse the law does not and cannot countenance. A narrow exception to the rule imputing an attorney's neglect to a client applies when an attorney abandons a client without notice. Negligence is not equivalent to abandonment.

*Cotleur v. Danziger*, 870 S.W.2d 234, 238 (Mo. banc 1994) (citations omitted). Courts have held that an attorney does not abandon his client when, (1) the attorney engages in representation of the client but fails properly to handle the matter; and (2) the attorney fails to properly cooperate in discovery. *Id.*; *Burleson v. Fleming*, 58 S.W.3d 599, 606 (Mo. App. W.D. 2001).

Rather, an attorney is considered to have abandoned his client when acts were not performed by him under the authority vested in him by virtue of his relationship to his client but were performed in repudiation of that relationship. *Boeckmann v. Smith*, 238 Mo.App. 855, 189 S.W.2d 449, 450–51 (Mo. App. 1945). For example, in *Boeckmann*, the appellate court held an attorney abandoned his client when he failed to inform the client of a notice of appeal and failed to inform the client he quit the practice of law. *Id.* at 449–51. And in *Parks v. Coyne*, the appel-

late court held an attorney abandoned his client where allegations supported by an affidavit alleged the attorney caused the client to believe that his insurance company's attorney would provide a defense but the company failed to do so. 156 Mo.App. 379, 137 S.W. 335, 337–38, 340 (Mo. App. 1911); *see Cotleur*, 870 S.W.2d at 238 (partially describing *Parks* in that manner).

■ The evidence in the record in this case reflects: Trams represented Defendants during the time of the Rule 61.01 discovery violations occurred; Trams, like Bashani, failed to appear at the December 11, 2015 rescheduled deposition; Trams failed to appear at the January 27, 2016 hearing on the Bank's second motion to compel; and Trams' appearance and representation of Defendants at the December 4 deposition is the last action counsel took on behalf of Defendants. In large part because the motion for reconsideration contains only bare allegations, there is simply no evidence in the record that the aforementioned acts and omissions were not performed by Trams under the authority vested in him by virtue of his relationship to his clients (Defendants) but were performed in repudiation of that relationship. Under these circumstances, we cannot find that Trams abandoned Defendants. *See Boeckmann*, 189 S.W.2d at 449–51; *Parks*, 137 S.W. at 337–38, 340; *see also Cotleur*, 870 S.W.2d at 238. Moreover, to the extent Trams may have engaged in representation of Defendants but failed properly to handle the matter and to the extent Trams may have failed to properly cooperate in discovery, those actions do not constitute abandonment but procedural neglect imputable to Defendants. *See Cotleur*, 870 S.W.2d at 238; *Burleson*, 58 S.W.3d at 606.

Based on the foregoing, Defendants' argument that their repeated discovery violations should not be imputed to them lacks merit.

### 3. Whether the Bank was Prejudiced by Defendants' Discovery Violations

■ In order to find the trial court's order striking Defendants' pleadings is justified and does not constitute an abuse of discretion, we must also find the record sufficiently shows the Bank was prejudiced by Defendants' repeated discovery violations. *See Stockmann*, 239 S.W.3d at 656; *Scott*, 136 S.W.3d at 190–92; *Norber*, 134 S.W.3d at 659–61; *Dobbs*, 969 S.W.2d at 899; *see also S.R.*, 115 S.W.3d at 865; *Binder*, 186 S.W.3d at 867. The Bank's second motion to compel alleged, "Defendants' conduct is outrageous and is prohibiting the Bank from preparing its case for the February 18, 2016 trial and to defend against the counterclaims filed against the Bank by the Defendants."

Viewing the evidence and all reasonable inferences therefrom in the light most favorable to the trial court's decision, which our standard of review requires us to do, the record demonstrates Defendants' discovery violations repeatedly caused the Bank delay and deprived it of potentially valuable information it could have used in preparing for trial. *See Scheck Indus. Corp.*, 435 S.W.3d at 717. Therefore, the record sufficiently shows the Bank was prejudiced by Defendants' repeated discovery violations. *See Anderson*, 181 S.W.3d at 190 (finding prejudice under similar circumstances).

### 4. Conclusion as to Point One

Because Defendants failed to answer interrogatories, gave evasive or incomplete answers to interrogatories, failed to produce documents, and failed to attend a deposition, the trial court had significant discretion to sanction Defendants by striking their pleadings. *See Holm*, 514 S.W.3d at 596–97, 2017 WL 770979 at *4; Rule

61.01(a). Moreover, the record sufficiently shows, (1) Defendants engaged in a pattern of repeated disregard of the obligation to comply with the rules of discovery; and (2) the Bank was prejudiced thereby. Therefore, the trial court's order striking Defendants' pleadings as a discovery sanction was justified and does not constitute an abuse of discretion. *See Stockmann*, 239 S.W.3d at 656; *Scott*, 136 S.W.3d at 190–92; *Norber*, 134 S.W.3d at 659–61; *Dobbs*, 969 S.W.2d at 899; *see also S.R.*, 115 S.W.3d at 865; *Binder*, 186 S.W.3d at 867. Point one is denied.

## C. The Trial Court's Award of Attorneys' Fees and the Bank's Motion for Attorneys' Fees on Appeal

We next consider Defendants' second point on appeal concerning the trial court's award of attorneys' fees and the Bank's motion for attorneys' fees on appeal, which has been taken with the case. Both relate to the attorneys' fees provisions in the Note and Guaranty.

### 1. The Attorneys' Fees Provisions in the Note and Guaranty

The Note executed by GB Investments has the following provision:

ATTORNEYS' FEES; EXPENSES. [The Bank] may hire or pay someone else to help collect this Note if [GB Investments] does not pay. [GB Investments] will pay [the Bank] that amount. This includes, subject to any limits under applicable law, [the Bank's] attorneys' fees and [the Bank's] legal expenses whether or not there is a lawsuit, including attorneys' fees and expenses for ... appeals.

Similarly, the Guaranty executed by Bashani has the following provision:

Attorneys' Fees; Expenses. [Bashani] agrees to pay upon demand all of [the Bank's] costs and expenses, including [the Bank's] attorneys' fees and [the Bank's] legal expenses, incurred in connection with the enforcement of this Guaranty. [The Bank] may hire or pay someone else to help enforce this Guaranty, and [Bashani] shall pay the costs and expenses of such enforcement. Costs and expenses include [the Bank's] attorneys' fees and legal expenses whether or not there is a lawsuit, including attorneys' fees and legal expenses for ... appeals.

### 2. The Trial Court's Award of Attorneys' Fees

In their second point on appeal, Defendants assert the trial court erred in awarding the Bank attorneys' fees it incurred in defending Defendants' counterclaims. The trial court's judgment awarded the Bank a total of $71,425.78 in attorneys' fees, which was the amount of fees the Bank incurred during the proceedings before the trial court, including fees the Bank incurred in defending the Defendants' counterclaims.[11] It is undisputed the trial court's award was made pursuant to the attorneys' fees provisions in the Note and Guaranty.

#### a. General Law and Standard of Review

 Missouri Courts follow the "American Rule," which provides that each

11. There is no indication in the record as to the precise amount of attorneys' fees the Bank incurred in defending Defendants' counterclaims. However, both parties agree the Bank incurred some attorneys' fees in defending Defendants' counterclaims. Additionally, the Bank's bills for attorneys' fees, which are part of the record on appeal and which the trial court's award of attorneys' fees was partially based, indicate that some of the attorneys' fees the trial court awarded to the Bank were fees the Bank incurred in defending Defendants' counterclaims.

party generally pays for its own attorneys' fees. *Scheck Indus. Corp.*, 435 S.W.3d at 732. However, one recognized exception to the American Rule is that a prevailing litigant may recover attorneys' fees from the other litigant when the terms of the parties' contract provides for the fees. *See id.*; *Lee v. Investors Title Co.*, 241 S.W.3d 366, 368 (Mo. App. E.D. 2007); *see also Kansas City Live Block 139 Retail, LLC v. Fran's K.C. Ltd*, 504 S.W.3d 725, 736 (Mo. App. W.D. 2016) ("even if the contract is silent on the issue, a party may only recover its fees under a contract provision if it is a prevailing party")" (quoting *Ken Cucchi Const., Inc. v. O'Keefe*, 973 S.W.2d 520, 528 (Mo. App. E.D. 1998)).

 Whether a trial court has authority to award a party attorneys' fees pursuant to the terms of a contract is a question of law that our Court reviews de novo. *Forbush v. Adams*, 460 S.W.3d 1, 8 (Mo. App. E.D. 2014). "If a contract provides for the payment of attorney[s'] fees in the enforcement of a contract provision, the trial court must award them to the prevailing party." *Lee*, 241 S.W.3d at 368 (quotations omitted); *see also Forbush*, 460 S.W.3d at 8. In that situation, the decision to award attorneys' fees is not a matter of the trial court's discretion, and the court's failure to do so is erroneous. *Lee*, 241 S.W.3d at 368.

### b. Defendants' Argument and Analysis

██ In this case, Defendants assert the trial court erred in awarding the Bank attorneys' fees it incurred in defending Defendants' counterclaims because the terms of the Note and Guaranty do not provide for recovery of those fees. We disagree.

The attorneys' fees provision in the Note provides in relevant part: "[The Bank] may hire or pay someone else to help collect this Note if [GB Investments] does not pay. [GB Investments] will pay [the Bank] that amount ... includ[ing] ... [the Bank's] attorneys' fees." Similarly, the attorneys' fees provision in the Guaranty provides in relevant part: "[Bashani] agrees to pay upon demand all of ... [the Bank's] attorneys' fees and [the Bank's] legal expenses [ ] incurred in connection with the enforcement of this Guaranty."

Defendants' breach of contract counterclaim alleged the Bank breached an agreement to renew the Note, Defendants' fraudulent and negligent misrepresentation counterclaims related to statements made by the Bank regarding Note renewal, and Defendants' counterclaims sought damages in excess of $260,000.00. Accordingly, if Defendants' prevailed on their counterclaims, (1) it could have affected the Bank's ability to collect the amount due on GB Investments' defaulted Note, which was $116,894.18 as of the time of the trial court's judgment; and (2) it could have affected the Bank's ability to enforce Bashani's Guaranty, under which he personally guaranteed GB Investments' obligations pursuant to the Note. Under these circumstances, we find attorneys' fees the Bank incurred in defending Defendants' counterclaims fell within the language of the Note and Guaranty allowing for the recovery of attorneys' fees incurred in the Bank's "hir[ing] or pay[ing] [of] someone else to help collect th[e] Note if [GB Investments] does not pay" and allowing for the recovery of attorneys' fees "incurred in connection with the enforcement of th[e] Guaranty." In other words, we find the terms of the Note and Guaranty provide for the recovery of attorneys' fees the Bank incurred in defending Defendants' counterclaims, because the counterclaims were in connection with the enforcement of the Note and Guaranty. *See Simpson v. Simpson*, 295 S.W.3d 199, 203–06, 211 (Mo. App. W.D. 2009) (finding attorneys' fees a

father incurred in appeal involving his son's counterclaims were recoverable pursuant to language in a promissory note providing for recovery of fees "associated with the collection of" the note). Therefore, the trial court did not err in awarding the Bank attorneys' fees it incurred in defending Defendants' counterclaims. Point two is denied.

### 3. The Bank's Motion for Attorneys' Fees on Appeal

 We now turn to the Bank's motion for attorneys' fees on appeal, which has been taken with the case. The Bank's motion seeks attorneys' fees pursuant to the attorneys' fees provisions in the Note and Guaranty and this Court's Special Rule 400.[12]

 Our Court may award a party reasonable attorneys' fees on appeal if they are authorized by a written agreement that is the subject of the issues presented on appeal. *Jamestowne Homeowners Ass'n Trustees v. Jackson*, 417 S.W.3d 348, 359–60 (Mo. App. E.D. 2013); *Rx Recalls, Inc. v. Devos Ltd.*, 317 S.W.3d 95, 96–97 (Mo. App. E.D. 2010). In this case, the attorneys' fees provision in the Note provides in relevant part: "[The Bank] may hire or pay someone else to help collect this Note if [GB Investments] does not pay. [GB Investments] will pay [the Bank] that amount ... including attorneys' fees for ... appeals." Similarly, the attorneys' fees provision in the Guaranty provides in relevant part: "[Bashani] agrees to pay upon demand all of ... [the Bank's] attorneys' fees ... incurred in connection with the enforcement of this Guaranty ... including attorneys' fees and legal expenses for ... appeals." The issues the Defendants' raise in this appeal—specifically whether the trial court erred in striking Defendants' counterclaims and whether the trial court erroneously calculated the Bank's damages—relate to the Bank's ability to collect the amount due on GB Investments' defaulted Note and the Bank's ability to enforce Bashani's Guaranty. Accordingly, attorneys' fees on appeal are authorized by a written agreement that is the subject of the issues presented on appeal, and we may award the Bank reasonable attorneys' fees on appeal. *See id.*

 Our Court has the authority to either allow and fix the amount of attorneys' fees on appeal or remand the cause with instructions for the trial court to determine the amount of attorneys' fees and enter judgment accordingly. *Jackson*, 417 S.W.3d at 360; *see also Kirchoff v. Hutchison*, 403 S.W.3d 109, 114 (Mo. App. E.D. 2013). Under the circumstances of this case, where we are denying all of Defendants' points on appeal and affirming the trial court's discovery order and judgment in all respects, it is in the interests of judicial economy for our Court to allow and fix the amount of attorneys' fees on appeal rather than to remand the cause to the trial court. Therefore, we grant the Bank's motion for attorneys' fees on appeal in the amount of $20,000.00.

### D. The Trial Court's Calculation of the Bank's Damages

In their third and final point on appeal, Defendants contend the trial court's judgment erroneously calculates the Bank's damages. The judgment found the Bank's damages were a total of $116,894.18, which was the amount of principal, accrued interest, and accrued charges due and outstanding under the Note, after applying all credits including the $325,000.00 foreclosure sale price of the Property.

12. Our Court's Special Rule 400 provides in relevant part: "Any party claiming an amount due for attorney[s'] fees on appeal pursuant to contract, statute or otherwise and which this court has jurisdiction to consider, must do so before submission of the cause."

### 1. Standard of Review and General Law

 The proper measure of a party's damages is a question of law that our Court reviews de novo. *Comens v. SSM St. Charles Clinic Medical Group, Inc.*, 335 S.W.3d 76, 81 (Mo. App. E.D. 2011); *66, Inc. v. Crestwood Commons Redevelopment Corp.*, 130 S.W.3d 573, 584 (Mo. App. E.D. 2003). The trial court's damages calculation in this case is what is referred to as a "deficiency calculation after a foreclosure." *See Frontenac Bank v. T.R. Hughes, Inc.*, 404 S.W.3d 272, 276, 278 (Mo. App. E.D. 2012). A court makes such a calculation where, as here, a defendant borrows money from a bank, the defendant defaults on the parties' loan agreement that is secured by a deed of trust on real property, the defendant owes a deficiency due under the agreement, and the bank forecloses on the real property. *See id.*

### 2. Defendants' Arguments and Analysis

 In this case, Defendants argue the trial court's deficiency calculation after a foreclosure is erroneous because the court used the Property's foreclosure sale price of $325,000.00 as part of the measure of damages, rather than the price paid to the Bank's wholly-owned subsidiary when it sold the Property for $425,000.00 months later—an amount Defendants contend was the "fair market value" of the Property. *See* footnote 5 in Section I.D. Defendants' main contention is that allowing the foreclosure sale price to be used as part of the Bank's measure of damages under those circumstances results in the Bank being awarded a windfall. *See Ameristar Jet Charter, Inc. v. Dodson Intern. Parts, Inc.*, 155 S.W.3d 50, 54 (Mo. banc 2005) (a general principle of awarding damages is that "[a] party should be fully compensated for its loss, but not recover a windfall"). However, we find Defendants' arguments have no merit because applicable case law from the Missouri Supreme Court and our Court dictate that the proper measure of damages in this case is the difference between the amount owed under the Note and the amount obtained at the foreclosure sale of the Property.

Arguments similar to Defendants' were raised in *First Bank v. Fischer & Frichtel, Inc.*, 364 S.W.3d 216 (Mo. banc 2012) and *T.R. Hughes*, 404 S.W.3d 272. In both of those cases, the defendants argued a deficiency calculation after a foreclosure should be measured by the difference between the amount owed under a loan agreement and the fair market value of the property, rather than by the difference between the amount owed under a loan agreement and the amount obtained at the foreclosure sale. *See First Bank*, 364 S.W.3d at 217, 219–20; *T.R. Hughes*, 404 S.W.3d at 278–79. Additionally, in *First Bank*, the defendant specifically argued that the foreclosure sale process and resulting foreclosure sale price "almost inevitably leads to windfalls for lenders." 364 S.W.3d at 218, 221.

In rejecting the defendant's claims in *First Bank*, the Missouri Supreme Court noted that the defendant's alleged problems with using the foreclosure sale price as part of the measure of damages primarily concerned the fairness of the foreclosure sale rather than the fairness of the trial court's deficiency calculation after a foreclosure. *Id.* at 222. The Supreme Court explained that in Missouri, a debtor is not permitted to attack the sufficiency of the foreclosure sale price as part of the deficiency proceeding even if it believes the foreclosure sale price was inadequate. *Id.* at 220. Instead, "a debtor who believes that the foreclosure sale price was inadequate can bring an action to void the *foreclosure sale* itself ... by showing that the inadequacy of the sale price is so gross that it shocks the conscience and is in itself evidence of fraud." *Id.* at 220–21 (emphasis

in original) (quotations omitted). Applying those principles, the Missouri Supreme Court "refused to modify 'the more than century-old practice of using the foreclosure sale price' rather than fair market value to determine a deficiency." *T.R. Hughes*, 404 S.W.3d at 279 (quoting *First Bank*, 364 S.W.3d at 224).

Similarly, in *T.R. Hughes*, our Court rejected the defendants' claims that the deficiency calculation after a foreclosure should be measured by the difference between the amount owed under loan agreements and the fair market value of the property, rather than by the difference between the amount owed under the loan agreements and the amount obtained at the foreclosure sales. 404 S.W.3d at 278–79. In coming to that conclusion, we noted the defendants did not attempt to void the foreclosure sales themselves at the time of the sales, the defendants did not allege fraud in the sales, and the bank complied with Missouri law in conducting the sales. *Id.* at 279. Under those circumstances, this Court held: "In accordance with the Missouri Supreme Court's affirmation [in *First Bank*] of well-established law in Missouri, we find [d]efendants' loans were credited properly with the amounts paid by [the bank] at the foreclosure sales." *T.R. Hughes*, 404 S.W.3d at 278–79.

Like the defendants in *T.R. Hughes*, Defendants in this case did not attempt to void the foreclosure sale itself at the time of the sale and did not allege fraud in the sale. *See id.* at 279. In addition, Defendants· do not allege the Bank did not comply with Missouri law in conducting the foreclosure sale of the Property. *See id.* Furthermore, pursuant to the reasoning and holdings of *First Bank* and *T.R. Hughes*, we find the proper measure of damages in this case is the difference between the amount owed under the Note and the amount obtained at the foreclosure sale of the Property.[13] *See First Bank*, 364 S.W.3d at 219–24; *T.R. Hughes*, 404 S.W.3d at 278–79. Finally, Defendants have not cited to any authority providing that the aforementioned measure of damages should not be used if it results in a lender such as the Bank being awarded a windfall.[14]

Based on the foregoing, the trial court's judgment does not erroneously calculate the Bank's damages by using the Property's foreclosure sale price of $325,000.00 rather than price paid to the Bank's wholly-owned subsidiary when it sold the Prop-

13. Defendants argue *First Bank* is distinguishable because the defendant in that case was a sophisticated entity, whereas Defendant Bashani is allegedly an "unsophisticated small business owner." We acknowledge the *First Bank* Court repeatedly referred to the defendant as a "sophisticated" entity and found in relevant part: *"perhaps* it is that the policy reasons raised by [the defendant] for lowering the burden required to show inadequacy of the foreclosure sale price principally apply to individuals and small businesses that have no realistic ability to bid themselves, not to a sophisticated business entity such as [the defendant]." 364 S.W.3d at 217, 218, 223, 224 (emphasis added). However, we find Defendants' argument that the reasoning and holding of *First Bank* do not apply to the circumstances of this case lacks merit because, (1) there is no express indication in *First Bank*,

364 S.W.3d at 217–24, or in any subsequent case law cited by Defendants or found by this Court, that a rule other than using the foreclosure sale price rather than fair market value to determine a deficiency should be applied when a borrower is less sophisticated; and (2) Defendants do not cite to any portion of the record to support their allegation that Bashani is an unsophisticated small business owner.

14. We also note Defendants have not demonstrated that allowing the foreclosure sale price to be used as part of the Bank's measure of damages resulted in the Bank being awarded a windfall in this case. In fact, testimony from the Bank's general counsel (Wulkopf) during the bench trial indicates the Bank did not receive a windfall by the trial court's use of the aforementioned measure of damages.

erty months later for $425,000.00. Point three is denied.

## III. CONCLUSION

The trial court's order striking Defendants' pleadings as a discovery sanction and the trial court's judgment in favor of the Bank are affirmed. In addition, the Bank's motion for attorneys' fees on appeal, which was taken with the case, is granted in the amount of $20,000.00.

Mary K. Hoff, J., and Lisa P. Page, J., concur.

During the bench trial, Defendants' counsel (Swiecicki) asked Wulkopf, "[if] the true money that [the Bank] lost would be the amount of money FB Realty received from [its sale of the Property to a third-party buyer] less the amount of the [N]ote," i.e., $425,000.00 less the total amount due and outstanding under the Note. Wulkopf responded, "No . . . ." Wulkopf then testified the Bank incurred a number of costs holding the Property after the foreclosure sale, including costs for, (1) filing several eviction lawsuits after the Bank found people living in the Property without a written lease 'and at the suggestion of Bashani; (2) cleaning out the basement of the Property, which was "full of garbage" and "looked like an episode of Hoarders"; and (3) repairing fixtures, baseboards, plumbing, and electric that were ripped out of the Property.