Anthony Rex Gabbert, Judge
Introduction[1]
Joseph S. Ely and Donald D. Upp ("Buyers" collectively) appeal the circuit court's judgment denying relief on their "Petition for Declaratory Relief, Injunctive Relief, Quiet Title, Recission and Restitution" and granting relief to William E. Alter, Merijo J. Alter, and Rivercene Bed and Breakfast, LLC ("Business")[2] on particular counterclaims. Buyers raise four points on appeal. They contend that the trial court erred, 1) in awarding Sellers both the $247,500 "amount due" as damages for Buyers' default on the License and Membership Interest Purchase Agreement ("LMA") and all rights and title to the Business and its assets, 2) in awarding $247,500 as damages for Buyers' default on the LMA, 3) in finding that Sellers are entitled to enforce the two deeds of trust, *3 and 4) in permanently enjoining Buyers from using the Business Trade Names.
Sellers cross appeal contending that the trial court erred, 1) in refusing to award Sellers attorneys' fees for enforcing the LMA, and 2) in refusing to award Sellers damages for Buyers' infringement of the Trade Names.
We reverse the portion of the circuit court's judgment denying Sellers attorneys' fees for enforcing the LMA (Sellers' first point on cross-appeal), and affirm the circuit court's judgment in all other respects.
Factual and Procedural Background
In 2004, Merijo and William Alter formed Rivercene Bed & Breakfast, LLC, for the purpose of purchasing real estate located at 127 County Road 463, New Franklin, Missouri, the contents of this real estate, and the Business that was operating on this real estate. In 2005, Sellers purchased adjoining real estate located at 115 County Road 463, New Franklin, Missouri ("White House"). The 127 County Road property and the White House property include approximately eight acres of land. (These two properties will collectively be referenced as the "Rivercene Property").
Sellers operated the Business at the Rivercene Property under the trade names "Rivercene Bed & Breakfast" and "Rivercene Mansion Bed & Breakfast" ("Trade Names" collectively). In about March 2010, Buyers offered to purchase the Rivercene Property, its contents, and the Business for a total price of $695,000. Sellers accepted the offer. On March 27, 2010, the parties executed a contract reflecting the agreement. The contract included the sale of the White House to Buyers for the price of $1.00. Closing was scheduled for May 10, 2010. The contract was conditioned upon Buyer Upp selling his house at 226 West Spring Street, Boonville, Missouri. Upp asked $198,500 for the Spring Street house but received no offers. The Alters agreed to purchase the property at the full asking price to help facilitate the closing on the Rivercene Property, the contents of the Rivercene Property, and the Business.[3]
Buyers were unable to obtain financing to complete the sale. Consequently, the parties agreed to split the purchase into two transactions. The real estate was sold to Buyers for $462,000, including the White House for $1.00, and the Business and contents were to be sold separately up to a year later for $233,000. The sale of the Rivercene Property closed on January 4, 2011. Contemporaneous with the closing on the Rivercene Property, the parties executed the LMA. The primary terms included postponement of payment of the remaining amount due from the original agreed $695,000 purchase price ($247,500 with the addition of closing costs and cost of a business plan) while Buyers operated, under the LMA, the Business with use of the contents and Trade Names. Buyers had until January 4, 2012, to close. In exchange, Buyers agreed to pay a nominal $75.00 per month license fee to Sellers. The LMA provided Sellers with a security interest in the licensed assets of the Business, and deeds of trust on the Rivercene Property.
The LMA provided, among other things, that an event of default was a failure of Buyers to pay the remaining $247,500 under the agreement. The LMA provided that if Buyers (the Licensees under the agreement) defaulted:
*4 Licensee shall have no further rights in the Licensed Assets of the Business, nor shall Purchaser [Buyers] have the right to purchase the Membership Interest. Furthermore, Purchaser shall pay to Licensor [the Bed and Breakfast, LLC] the full amount of net revenue received from operation of the Business during the term of the License, plus interest at the Default Rate. In addition, Licensor and Seller shall have all rights and remedies available under the Security Agreement, Deed of Trust and the Second Deed of Trust, in addition to any court costs and reasonable attorneys' fees for enforcing the terms of this Agreement, whether or not legal action is taken.
Immediately following the Rivercene Property closing, Buyers began operating the Business, utilizing the contents of the Rivercene Property, and exclusively using the licensed Trade Names. Sellers allowed Buyers to use Sellers' Missouri State tax number for reporting sales.
Buyers were unable to obtain funding to finalize the sale by the January 4, 2012 deadline. The deadline was extended to May 1, 2012, and then again to May 1, 2013. Buyers paid a $5,000 deposit and agreed to increase the license fee to $989 per month. The license fee increase was due, in part, to prospective lenders desiring to confirm Buyers' ability to repay the requested mortgage amount. During the ensuing months, Buyers paid Sellers the monthly $989 license fee. The May 2013 closing date expired, and Sellers verbally agreed to extend the closing to January 2014. Buyers continued to operate the Business and utilize the contents of the Rivercene Property and the Trade Names.
In late fall 2013, Buyer Ely met with the Alters and a real estate agent. Ely requested additional credits toward the $247,500 payment price. The LMA had previously been amended to give Buyers a credit of $10,000 ($2,500 for their work at the Business before closing, $2,500 for the business plan, and $5,000 for their deposit paid with the amendment to the LMA) as well as one-half credit for license fees paid (the monthly payment of $75 and later $989) if they closed on May 1, 2013.
On January 27, 2014, Buyers' counsel emailed Sellers and their counsel claiming that Buyers were the owners of the Business and fully authorized to take action on behalf of the Business. The email announced Buyers' repudication and breach of the LMA and its Amendment, demanding that Sellers accept only $175,000 as the full amount due at the closing.[4] In response to the January 27, 2014 email and further communications from Buyers' counsel that Buyers would not perform under the agreements, Sellers recorded the second deed of trust on the 127 County Road property and filed a UCC-1 Financing Statement. Pursuant to the LMA, the first deed of trust on the White House had already been recorded.
In March of 2014, Buyers, without permission of Sellers, filed with the Missouri Secretary of State several registrations of the Trade Names and variations thereof. Buyers then filed suit against Sellers. Buyers alleged, among other things, that the LMA, the deeds of trust, and the security agreement should be rescinded. Buyers claimed that they owned the Business, and that the Trade Names were invalid because they were not "registered" as trademarks. Buyers also claimed that the contents list of the Rivercene Property was fraudulent.
On June 2, 2014, Sellers filed a counterclaim. Sellers sought a declaration that *5 Buyers were not owners of the Business. Sellers sought payment of the remaining $247,500 due under the agreement and the right to enforce the security agreement and deeds of trust. Sellers sought attorneys' fees and costs under the LMA. Sellers alleged Trade Name infringement and the right to recover damages. Sellers requested an injunction against Buyers for continuing to use the Trade Names and for registering with the Secretary of State the Trade Names and variations thereof.
After approximately six days of trial (spread out over four months), the circuit court entered Findings of Fact, Conclusions of Law and Judgment on January 31, 2017. Therein, the court rejected all of Buyers' claims. On Sellers' Count I counterclaim for reformation or cancellation of the Assignment of Membership Interest,[5] the court declared Sellers sole owners of the Business, Trade Names, and contents of the Rivercene Property. On Sellers' Count II breach of contract counterclaim, the court entered judgment in favor of Sellers and against Buyers, "jointly and severally in the amount of $247,500.00 plus interest thereon at the statutory rate of nine percent (9%) per annum ... until the Judgment is satisfied in full." The court stated that "[t]his represents the amount due from [Buyers'] failure to perform the Business Closing." As part of the court's judgment regarding the breach of contract claim, the court enjoined Buyers from further use of the Trade Names. The court did not award attorney fees pursuant to the LMA or net revenue from Buyers' operation of the Business.
On the remainder of Sellers' counter-claims - Count III, Breach of Contract of Good Faith and Fair Dealing, Count IV, Federal Common Law Infringement and Unfair Competition, Count V, Dilution, Count VI, Missouri Common Law Unfair Competition, and Count VII, Unjust Enrichment, the court entered judgment in favor of Buyers.
Following the court's entry of Judgment, Sellers filed a timely Motion to Correct, Amend, or Modify the Judgment concerning attorneys' fees. Buyers filed no post-judgment motions. On May 3, 2017, the court denied Sellers' post-judgment motion. This appeal by Buyers and cross-appeal by Sellers follows.
Standard of Review
Our standard of review is set forth in Murphy v. Carron , 536 S.W.2d 30, 32 (Mo. banc 1976). Schollmeyer v. Schollmeyer , 393 S.W.3d 120, 122 (Mo. App. 2013). We will affirm the circuit court's judgment unless it is unsupported by substantial evidence, it is against the weight of the evidence, or it erroneously declares or applies the law. Id. at 122-123. We view the evidence and all reasonable inferences in the light most favorable to the court's judgment. Id. at 123. We defer to the trial court's credibility determinations, recognizing that the court is free to accept or reject all, part, or none of the testimony presented. Soderholm v. Nauman , 466 S.W.3d 610, 617 (Mo. App. 2015).
BUYERS' APPEAL
Buyers' First Point - Windfall Double Recovery
In their first point on appeal, Buyers contend that the circuit court erred in awarding Sellers both the $247,500 "amount due" as damages for Buyers' default *6 on the LMA and all rights and title to the Business and its assets, arguing that the twin awards amount to an impermissible windfall double recovery. We find no double recovery.
As noted above, the LMA provided, among other things, that an event of default was failure of Buyers to pay the $247,500 for the Business closing. The LMA provided that if Buyers (the Licensees under the agreement) defaulted:
Licensee shall have no further rights in the Licensed Assets of the Business, nor shall Purchaser [Buyers] have the right to purchase the Membership Interest. Furthermore, Purchaser shall pay to Licensor [the Bed and Breakfast, LLC] the full amount of net revenue received from operation of the Business during the term of the License, plus interest at the Default Rate. In addition, Licensor and Seller shall have all rights and remedies available under the Security Agreement, Deed of Trust and the Second Deed of Trust, in addition to any court costs and reasonable attorneys' fees for enforcing the terms of this Agreement, whether or not legal action is taken.
Under the plain language of the LMA, all permanent rights and title to the Business and its assets were contingent upon Buyers paying $247,500 for the Business closing. Buyers concede that they defaulted under the LMA and refused to pay $247,500 to close on the Business. The court's declaration that Sellers were the owners of the Business, trade names, and contents of the Rivercene Property was not an "award" to Sellers; it was a declaration that ownership of the Business had never changed and that the altered Assignment of Membership Interest document relied on by Buyers was "of no effect."
The court rejected Buyers' plea to rescind the LMA finding that the LMA could not be rescinded due to it being part of an "integrated deal" with the purchase of the Rivercene Property. The court found that "the agreements are interrelated such that Ely and Upp cannot stand on the real estate portion of the past agreements while rejecting the License Agreement."[6] The trial court found in favor of Sellers on their counterclaim for breach of contract and ordered Buyers to pay $247,500, plus interest, which represented "the amount due from [Buyers'] failure to perform the Business Closing." In ordering the $247,500 due under the contract, as well as interest provided for in the LMA in the event of a breach, the court was requiring Buyers to perform their contractually agreed upon obligations under the LMA. Sellers concede that "[u]pon payment of all amounts due and owing, the Sellers must provide the 'Assignment of Membership Agreement' and all things under the LMA to the Buyers." Given that the court found that the Business sale portion of the agreement could not be separated from the real estate portion of the agreement, specific performance of the Business sale agreement was one of the only adequate remedies available to address the breach.
Buyers' characterization of the court's judgment as double recovery is misplaced. The court awarded one recovery to Sellers for Buyer's breach and that was specific performance of the contract. Buyers' attempt on appeal to characterize the court's judgment as awarding a double recovery, suggesting that Sellers were only entitled to the difference between the sale price of the Business and the market value of the *7 Business at the time of default, is a back door attempt to force recission of the Business portion of the contract while not challenging the court's findings that the Business portion of the contract could not be separated from the real estate portion.
Buyers argue that the court did not order (and could not have ordered) specific performance of the contract because Sellers did not seek specific performance. We disagree. Buyers initiated litigation by suing Sellers for recission of the LMA. In their petition Buyers alleged that, when Buyers purchased the Rivercene Property, Sellers ceased operating the Business and Buyers operated the Business at all times thereafter. After January of 2011, Buyers also registered the business names of "Rivercene," "Rivercene Mansion," "Rivercene Bed & Breakfast," and "Rivercene Mansion Bed & Breakfast" with the Missouri Secretary of State in their own names. For a variety of reasons, Buyers asserted in their petition that the LMA was unenforceable. Buyers further contended that, because they owned the Rivercene Property, they had a right to operate the Business on the Rivercene Property in spite of the LMA. Buyers asked the court to declare the LMA and associated documents void and to rescind the transactions and force Sellers to return $33,000 Buyers paid under the LMA in monthly licensing fees and deposits. Moreover, it is clear from Buyers' pleadings that, if the court granted Buyers' requests, Buyers intended to continue operating the Business under the Trade Names without paying the contractually agreed upon price for the Business and its assets.
In answer to Buyers' petition, Sellers asked the court to deny Buyers' requests, including their requests to void the LMA. Sellers consistently, in defense of Buyers' claims and in support of their own, asked for fulfillment of the LMA. Merijo Alter was called as a witness in Buyers' case in chief. On cross-examination she was asked, "Are you asking the Court to have the Plaintiffs pay the $247,500 under the license agreement?" She responded, "Yes." William Alter testified that he was asking the court to deny Buyers' request to void the LMA. He testified on Sellers' counterclaims that Sellers were seeking $247,500 "due under the agreement," plus the interest provided for under the LMA in the event of default. He also testified that the LMA contained a provision that "the non-defaulting party may insist upon the full and complete satisfaction and performance by the other of each and all respective provisions thereof to be satisfied and performed, in the manner and to the extent the same are herein required to be satisfied and performed."
We find nothing in the record indicating that Sellers' request for $247,500 under their breach of contract counter-claim was for anything but specific performance of the LMA. As the court declined to void the contract as requested by Sellers, the contract remains and the $247,500 ordered by the court is the amount due under the contract. There is no dispute that Buyers defaulted under the contract. The court, therefore, justifiably concluded that Sellers were "entitled to all rights and remedies arising from the breach, including non-judicial enforcement of the Deeds of Trust, the Security Agreement and the UCC-1 Financing Statement." These were all terms Buyers agreed to in the event of default. Consequently, everything ordered by the court in relation to Buyers' default merely enforced the contract entered into by the parties.
Buyers' argument that this court is reviewing a "novel situation" because it involves review of a remedies provision that "stripped the buyer of his right to purchase *8 the business upon default together with a judgment that awarded sellers full rights and title to the business and the full purchase price thereon" is misplaced. While the provision does allow Sellers the option to deny Buyers' purchase of the Business upon default, Sellers did not take this option. Buyers requested fulfillment of the contract, something they also had a right to pursue under the contract. There has been no windfall recovery by Sellers. Sellers always had full rights and title to the Business; Buyers' rights to the Business were temporary, with any permanent right vesting only upon completion of the contract.[7]
The court did not err in ordering Buyers to pay the $247,500 due under the LMA. Buyers' first point on appeal is denied.
Buyers' Second Point - Damage Award
In their second point on appeal, Buyers contend that the trial court erred in awarding $247,500 as damages for Buyers' default on the LMA. They contend that there is no substantial evidence that Sellers suffered this or any other measure of damages in that Sellers failed to establish the net profits Buyers earned from the Business and failed to establish or argue lost profits, diminution in value, or any other theory of damages.
Our determination that the court justifiably ordered specific performance of the LMA by ordering Buyers to pay "the amount due from [Buyers'] failure to perform the Business Closing" is dispositive of this point. The $247,500 judgment is not for "damages" but represents the amount due under the contract. Sellers concede that all rights, title, and interest in the Business will pass to Buyers upon payment of the judgment.
The court did not err in ordering Buyers to pay the $247,500 due under the LMA. Buyers' second point on appeal is denied.
Buyers' Third Point - Deeds of Trust
In their third point on appeal, Buyers contend that the court erred in finding that Sellers are entitled to enforce the two deeds of trust. Buyers argue that those agreements are void because there is no debt the deeds of trust could be used to recover that Buyers owe Sellers. Buyers contend that the deeds of trust never secured any debt and, therefore, lacked adequate consideration.
In its Judgment, the circuit court found that in December of 2010, Buyers learned that they did not qualify for a loan for the agreed $695,000 price for the Rivercene Property, contents of the Rivercene Property, the Business, and Business assets, and were only able to pay $462,000 at that time. Consequently, the parties agreed to break the transactions into two separate closings. Buyers would first purchase the Rivercene Property and later purchase the Business and Business assets. The court found that, at trial, Buyers admitted that the parties agreed to this two-stage closing to allow Buyers time to pay the remainder of the agreed $695,000 purchase price. Buyers admitted that the purchase price never changed and that only the manner in which the purchase was structured changed.
The LMA was executed at the same time the Rivercene Property closing occurred. The parties entered into the LMA with the primary terms of that agreement being postponement of the remaining amount due, with Buyers operating the Business under a temporary license agreement *9 for a nominal license fee. Buyers were entitled to keep the profits from the Business while operating under the temporary license. The court found that for the period of 2011 to the first quarter of 2014, Buyers reported to the Missouri Department of Revenue gross revenue of $133,277.70 from the Business. The court found that Sellers at all times fulfilled their obligations under the LMA. The court found that Buyers "understood when they signed the License Agreement that they were providing security or collateral by executing the two Deeds of Trust and the Security Agreement" and that Buyer Ely "admitted that the Deed of Trust for the 115 Property and the second Deed of Trust for the 127 Property were part of the 'deal[.]' Buyers do not dispute these findings.
The LMA states that the deeds of trust were to "secure performance by Purchaser and Licensee of their obligations under this Agreement, including without limitation their obligation with respect to the License and payment of the Purchase Price for the Membership Interest[.]" The LMA further states that, upon default, Buyers would pay to Sellers the full amount of net revenue received from operation of the Business during the term of the License. The deeds of trust state, in part:
WHEREAS, Borrower and Lender have entered into and executed that certain License and Membership Interest Purchase Agreement dated as of January 4, 2011 (the 'Purchase Agreement'), whereby Borrower has agreed to license certain assets used in the operation of the Rivercene B&B and to purchase all of the Membership Interest in Lender.
AND WHEREAS, This Deed of Trust is also given to secure performance of Borrower's obligations under and pursuant to Purchase Agreement, and of any other indebtedness at any time arising from any Borrower to Lender however arising, whether by notes, drafts, open accounts, breach of agreement or otherwise, all of which, together with the Borrower's obligations under the Purchase Agreement, is called the 'Indebtedness'[.]
It is clear from the court's undisputed findings of fact that there would have been no sale of the Rivercene Property without Buyers' agreement to also purchase the Business, Business assets, and the Rivercene Property contents. The original agreement was for the Rivercene Property purchase and Business purchase to occur simultaneously. Splitting the transaction, delaying closing on the Business, and allowing Buyers to operate the Business at a nominal cost while enjoying the profits all represented consideration for the deeds of trust. The deeds of trust secured payment of the purchase price of the Business/contents/Trade Names, and the net revenue due Sellers upon default.[8]
We find that the deeds of trust continue to secure payment of the contractually agreed upon price of the Business, and the court's Judgment ordering payment of $247,500 to fulfill this obligation represents an "indebtedness" arising from Buyers'
*10 breach of the LMA.[9] The trial court did not err in finding that Sellers are entitled to enforce the two deeds of trust due to Buyers' default under the LMA.
Buyers' third point on appeal is denied.
Buyers' Fourth Point - Trade Name Use Injunction
In their fourth point on appeal, Buyers contend that the trial court erred in permanently enjoining Buyers from using the Trade Names, including the names "Rivercene Bed & Breakfast." Buyers argue that Sellers failed to establish they had any exclusive or protectable rights to these geographic and descriptive names.
The LMA states that Sellers operated the Business "under the names of 'Rivercene Bed & Breakfast' and sometimes referred to as 'Rivercene Mansion Bed & Breakfast' (the 'Trade names')[.]" The "Temporary License" provided Buyers under the LMA states that the "License shall include use of certain assets currently used in operating the Business as set forth in the attached Schedule 4 (the 'Licensed Assets')." Schedule 4 includes "the Trade Names" among the "Licensed Assets." The default provision of the LMA states that, "[u]pon the occurrence of an Event of Default, the License shall be immediately deemed terminated and revoked. In such event, Licensee shall have no further rights in the Licensed Assets or the Business...."
The trial court found that, the "Trade Names from at least the Lenz ownership in the 1990's to the present, one or both of the Trade Names have been used in commerce to refer to the Rivercene Property and the Bed & Breakfast Business thereon." The court concluded that Buyers "agreed to the validity of the Trade Names by licensing same and they solely used the Trade Names, in commerce, from January 4, 2011 through approximately March 2014, under the License Agreement, dated January 4, 2011." The court additionally found that, under the LMA, Buyers promised to operate the Business on the Rivercene Property solely under the licensed Trade Names, and did so from January 4, 2011 through March 2014. The court found that in March of 2014, Buyers registered with the Missouri Secretary of State fictitious names, the Trade Names (and variations of the Trade Names) owned by Sellers and without Sellers' permission. The court found that, by licensing the Trade Names, Buyers recognized their validity as Trade Names. The court noted that Buyer "Upp also acknowledged the unique spelling of the Rivercene enhanced the identity of the Rivercene Estate."
We find that, although Buyers argue on appeal that "Rivercene Bed & Breakfast" is not "protectable" and is not a "trade name," the circuit court correctly determined that Buyers conceded otherwise when agreeing to the terms of the LMA and licensing the Trade Names with the Missouri Secretary of State. Where Buyers expressly acknowledged "Rivercene Bed & Breakfast" as a Trade Name in the LMA, and agreed in the LMA that they would have no further rights in the Trade Names upon default, Buyers cannot now argue the invalidity of the Trade Names or that Buyers are entitled to use of the Trade Names.[10]
Buyers' fourth point on appeal is denied.
*11 SELLERS' CROSS-APPEAL
Sellers' First Point - Attorneys' Fees
Sellers cross-appeal contending in their first point that the trial court erred in refusing to award them attorneys' fees for enforcing the LMA. Sellers argue that the trial court lacked discretion to refuse to award attorneys' fees because the LMA contains a mandatory provision requiring such fees to be awarded. We agree.
"If a contract provides for the payment of attorney fees in the enforcement of a contract provision, the trial court must award them to the prevailing party. In that situation, the decision to award attorneys' fees is not a matter of the trial court's discretion, and the court's failure to do so is erroneous." Frontenac Bank v. GB Investments , LLC , 528 S.W.3d 381, 396 (Mo. App. 2017) (internal quotation marks and citations omitted).
The LMA provides that, "Licensor and Seller shall have all rights and remedies available under the Security Agreement, Deed of Trust and the Second Deed of Trust, in addition to any court costs and reasonable attorneys' fees for enforcing the terms of this Agreement, whether or not legal action is taken." The trial court concluded that Sellers were "entitled to all rights and remedies arising from the breach[.]" The trial court noted that, "[t]he License Agreement contains a provision that provides [Sellers] with recovery of the court costs of this action, along with their attorneys' fees." Nevertheless, the court denied attorney fees to Sellers on the grounds that, "none were proven up and the Court declines to award the same."
Sellers contended in their motion to modify the court's judgment that the parties had agreed, with assent of the court, to defer submission of evidence regarding attorneys' fees until after judgment. Buyers did not dispute this but contended that the LMA was ambiguous and, therefore, the trial court had discretion to ignore the provision.[11] The trial court, however, found the LMA unambiguous. Both Buyers and Sellers requested attorneys' fees at trial and neither suggested at trial that the attorney fee provision in the LMA was ambiguous.[12]
Given Buyers' admitted default under the LMA and that Buyers initiated suit by petitioning the court to rescind the LMA, thereby forcing Sellers to defend the LMA's validity and pursue enforcement, we find that the court had no discretion to deny Sellers attorneys' fees for enforcing the terms of the LMA.
Sellers' first point on cross-appeal is granted.[13]
Sellers' Second Point - Damages for Trademark Infringement
In Sellers' second point on appeal, Sellers contend that the court erred in refusing to award Sellers damages for Buyers' infringement of the Trade Names. Sellers contend that because the court ruled that Buyers infringed the Trade Names, damages are mandated. Sellers argue that they met their burden of proving damages by presenting Buyers' gross profits, *12 thereby shifting the burden to Buyers to prove deductions from gross profits. We find no error.
Buyers argued at trial that Sellers had no exclusive right to use or sell the Trade Names and that the Trade Names had no value. The court disagreed and found that the Trade Names had been used in commerce and that Buyers recognized the validity of the Trade Names when licensing the names, paying a license fee for three years, and operating the Business using the Trade Names in commerce. The court's finding that, "[d]uring the period March 2014 through trial, based upon the Court's extrapolation, Ely and Upp grossed $92,269.56 from operation of the Bed & Breakfast" was set forth as part of the court's response to Buyers' claim that they received no value (consideration) for entering into the LMA.
There is no dispute that the LMA was breached by Buyers. The remedy provided in the LMA for breach of the LMA was that the Licensee would have no further rights to the Licensed Assets. The court enjoined Buyers from further use of the Trade Names under the terms of the LMA.
On appeal, Sellers erroneously contend that the court ruled in their favor on their claim for trademark infringement but declined to award damages. The court's findings addressing Buyers' claims regarding the Trade Names (and addressing Buyers' agreements under the LMA regarding the Trade Names) were not a determination that Sellers had proven their claims for trademark infringement. To the contrary, the court expressly found that Sellers failed to "fully establish common-law trademark and/or sufficient damages for same. As such, their claims for trademark infringement are denied."
As Sellers do not challenge the court's finding that they failed to establish common-law trademark infringement, their claim of entitlement to damages for trademark infringement is not reviewable and necessarily fails.
Sellers' second point on cross-appeal is denied.
Conclusion
We conclude that the circuit court did not err in, 1) ordering Buyers to pay $247,500 due under the LMA, 2) finding that Sellers are entitled to enforce the two deeds of trust under the LMA, 3) enjoining Buyers from using the Trade Names under the LMA, and 4) in refusing to award Sellers damages for infringement of the Trade Names.
We conclude that the court did err in failing to award Sellers attorneys' fees for enforcement of the LMA. We reverse the portion of the circuit court's judgment denying Sellers attorneys' fees and remand with instructions to award Sellers their reasonable attorneys' fees associated with enforcing the terms of the LMA. In all other respects, the Judgment is affirmed.
All concur.

Sellers' Motion to Strike Buyers' Reply Brief or Portions Thereof was taken with the case and is denied.

William E. Alter, Merijo J. Alter, and the Business will collectively be referenced as "Sellers."

A few months after closing, the Alters sold the Spring Street property to a third party for a loss of approximately $40,000.

Buyer Ely admitted at trial that he was unable to obtain a loan for $175,000.

Buyers initially claimed that Sellers had already assigned their interests in the Business, the contents of the Rivercene Property, and Trade Names to Buyers. Buyers admitted at trial that this never occurred and that Buyer Ely altered the Assignment of Membership Interest document relied on to make this claim.

The court found that rescission of the entire transaction would be inequitable as it would prejudice Sellers and harm innocent third parties.

Buyers' essentially ask for a windfall - to be relieved of their agreement to pay $247,500 for the Business and yet be allowed to own, run, and profit from the Business and its assets.

The court determined that Buyers reported gross revenue of $133,277.70 from operation of the Business during 2011 to the first quarter of 2014, and grossed $92,269.56 from March 2014 through trial. The court denied Sellers' claim for net revenue under the LMA finding that, although Buyers refused to provide financial information and documents such that net revenue could be ascertained, "methods of discovery enforcement were not pursued and any judgment the Court would enter herein would only be based on speculation." Sellers do not challenge the court's ruling on this issue.

Buyers argue, "If the deeds of trust are allowed to stand, Seller could try to use them to force the sale of Rivercene to collect the $247,500 sale price even while retaining the Business and its assets" resulting in a "windfall" to Sellers. As explained above, Sellers concede that once Buyers pay the $247,500 sale price, Sellers must transfer all right, title, and interest in the Business and Business assets to Buyers.

Although the court's Judgment enjoins Buyers from "permanent" use of the Trade Names, Sellers concede that once Buyers have fulfilled the terms of the contract in purchasing the Business, Buyers will then have all right and title to use of the Business assets.

Buyers make this same argument on appeal.

Both parties included provisions for attorneys' fees in their proposed judgments, providing that affidavits and proof of attorneys' fees and court costs would be submitted post-judgment.

Sellers' Motion for Attorneys' Fees, taken with the case, is granted in accordance with this Opinion.